**Irma Serrano ZANI, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 1001–83.**

Court of Criminal Appeals of Texas, En Banc.

Dec. 11, 1985.

David R. Weiner, Court Appointed on appeal only, San Antonio, for appellant.

Alger H. Kendall, Jr., Dist. Atty., Karnes City, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

W.C. DAVIS, Judge.

Appellant was convicted of murder in a bench trial and sentenced to thirty years incarceration at the Texas Department of Corrections.

The San Antonio Court of Appeals affirmed, concluding that sufficient evidence was adduced to show that appellant "directly" caused the death of Julius Alfred Dess and that, therefore, appellant was not entitled to immunity under an agreement given by the district attorney. *Zani v. State*, 657 S.W.2d 196 (Tex.App. San Antonio—1983).

We granted appellant's petition for discretionary review to determine what level of proof is necessary to defeat an immunity agreement and upon whom this burden is placed.

The record reflects that appellant and her husband, Robert Zani, posing as prospective real estate buyers, robbed and killed Julius Alfred Dess, a real estate agent. Dess, after being lured to the realty site, was shot three times in the head with a .25 caliber pistol. Three dollars and some credit cards were removed from his possession. Dess's body was buried in a shallow grave in Nueces County where appellant and her husband transported it after the shooting.

Shortly thereafter appellant and her children went to Acapulco, Mexico, where appellant's relatives resided. Appellant's husband was incarcerated and an investigation was begun into Dess's murder.

Learning of appellant's location several investigators went to Acapulco in order to interview her on May 15, 1980. Appellant readily implicated her husband in the killing but refused to return to Texas lest she be prosecuted.

One of the several officers present returned to Texas to have an immunity agreement prepared, which was signed by the district attorney and two district judges and airmailed back to Acapulco. Appellant assented to cooperate in accord with the agreement and returned to Texas with the officers on May 27, 1980.

The immunity agreement reads in relevant part:

I do hereby agree as District Attorney for the State of Texas for Atascosa County, Texas, to not seek an indictment

and to not prosecute Irma Serrano Reyes de Zani if she did not directly cause the death of Julius Alfred Dess and she does the following:

1. Return to Texas.
2. Give a complete statement of the events of Julius Alfred Dess's death.
3. Cooperate with our investigators and all agencies investigating the death of Julius Alfred Dess.
4. Turn over all evidence, pieces of evidence and all information known to her about the death of Julius Alfred Dess.

Pursuant to the agreement appellant gave a statement on May 29, 1980, in which she implicated her husband as the sole participant in the actual killing of Dess. However, after failing a lie detector test, appellant admitted firing the third shot into the head of Dess at the insistance of her husband. This second statement, given June 4, 1980, included the following:

I gave a statement to Texas Ranger G.E. Powell on Thursday, May 29, 1980 about Robert Zani shooting Mr. Julius Alfred Dess. At that time I told Ranger Powell that Robert Zani was the only person who shot Mr. Dess. I now wish to correct that statement and say that everything I said in that statement is the truth except that I also shot Mr. Dess one time. Robert Zani was in the rear seat and he shot Mr. Dess two or three times. Robert Zani then gave me the pistol and told me to shoot Mr. Dess. I told him I think he is dead. Robert Zani said so what and put the gun in my hand. I closed my eyes and shot Mr. Dess one time.

Appellant was then arrested and charged with the murder of Dess.

Appellant, through her attorney, filed a "Motion to Dismiss Indictment" on grounds that appellant had immunity prior to trial and a a pre-trial hearing was held.

The only evidence presented by the State to show that appellant "directly" caused

the death of Dess and was thus not entitled to immunity was appellant's second statement and the autopsy findings describing the condition of Dess's body after its recovery.[1]

Based on this evidence presented at the pre-trial hearing the trial court overruled the "Motion to Dismiss" the indictment and allowed the case to proceed to trial, concluding that "there is evidence from which it could be concluded that Ms. Zani directly caused or was one of the persons causing the death of Julius Dess."

During the trial the State presented additional evidence on the issue of whether or not appellant directly caused the death of Dess. Dr. Joseph C. Rupp, a forensic pathologist and the Nueces County Medical Examiner, testified extensively as to the three gunshot wounds found on Dess. Because of our disposition of the case this evidence need not be evaluated.

The trial court determined that the evidence presented at the pre-trial hearing, coupled with the trial evidence, was sufficient to show that appellant directly caused the death of Dess. Therefore, the immunity agreement was ineffective and the prosecution was not barred. Appellant was then convicted of murder.

Appellant contended on appeal that, due to the immunity agreement, she could not be prosecuted as a party to the offense, and since the State had not shown beyond a reasonable doubt which bullet or bullets "directly caused the death" of Mr. Dess, the evidence was insufficient to substain her conviction.

The Court of Appeals overruled her challenge holding that "[A]lthough this evidence [pre-trial], standing alone, might fall short of the legal mark of guilt beyond a reasonable doubt," the testimony of Dr. Rupp, elicited at the trial in chief, when added to the pretrial evidence was sufficient to sustain her conviction. Additionally, the Court of Appeals held the immunity agreement unenforceable because of appel-

---

1. The autopsy report only described the condition of the body, and stated simply that the

cause of death was "multiple gunshot wounds of the head."

lant's misstatement of the facts made in her initial discussion with the police. Because the agreement was unenforceable the Court of Appeals held that she could be tried under the law of parties.

The power of a government to compel in court or grand jury testimony is firmly established in Anglo-American jurisprudence. This governmental power is coupled with a corresponding duty on the part of persons to testify. Both the government's power and the individual's duty are included in the Sixth Amendment requirements that an accused be confronted with the witnessess against him and have compulsory process for obtaining his own witnesses.

Among the necessary and most important powers of the States as well as the Federal Government to assure the effective functioning of government in an ordered society is the broad power to compel residents to testify in court or before grand jurors or agencies. *Murphy v. Waterfront Commission,* 378 U.S. 52, 93–94, 84 S.Ct. 1594, 1611, 12 L.Ed.2d 678 (1964) (White, J., concurring).

However, limits on this governmental power also exist. The privilege against compulsory self-incrimination embodied in the Fifth Amendment is the most important and pervasive of these limits. This privilege can be asserted in any proceeding and protects against disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used. The United States Supreme Court has described the privilege and its importance in numerous cases. The most succinct discussion occurs in *Murphy v. Waterfront Commission,* supra, 378 U.S. at 55 84 S.Ct. at 1596:

The privilege against self incrimination 'registers an important advance in the development of our liberty—"one of the great landmarks in man's struggle to make himself civilized." ' *Ullmann v. United States,* 350 U.S. 422, 426, 76 S.Ct. 497, 500, 100 L.Ed. 511. It reflects many of our fundamental values and most noble aspirations: our unwillingness to sub-ject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitional system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates 'a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load,' 8 Wigmore, Evidence (McNaughten rev., 1961), 317; our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life,' *United States v. Grunewald,* 2 Cir., 233 F.2d 556, 581–582 (Frank J. dissenting), rev'd 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a shelter to the guilty,' is often 'a protection to the innocent.' *Quinn v. United States,* 349 U.S. 155, 162, 75 S.Ct. 668, 673, 99 L.Ed. [964] 969.

Immunity statutes and agreements not to prosecute do not embrace these values. Instead they seek to strike a balance between the imperatives of the privilege and the legitimate demands of the government. The concept of immunity as a buffer between the overriding objectives is a practical recognition of the importance of required testimony and the reasonable belief that very often only those implicated in the crime have any useful knowlege of its particulars. Indeed, this Court has many times recognized this principle. In *Camron v. State,* 32 Tex.Cr.R. 180, 22 S.W. 682 (App.1893), this Court clearly embraced this notion of the necessity for immunity agreements.

From the earliest times it has been found necessary, for the detection and punishment of crime, for the State to resort to the criminals themselves for testimony with which to convict their confederates in crime. While such a course offers a premium to treachery, and sometimes

permits the more guilty to escape, it tends to prevent and break up combinations by making criminals suspicious of each other, and it leads to the punishment of guilty persons who would otherwise escape.

Immunity is clearly not attractive to our notions of justice and morality. However, because of the difficulty in uncovering criminal activity, it is a pragmatic and necessary tool in criminal prosecution and prevention.

Though a procedure for the granting of immunity has not been expressly provided by the Legislature of this State, in *Ex Parte Muncy*, 72 Tex.Cr.R. 541, 163 S.W. 29 (Tex.Cr.App.1914), the Court made clear that such a procedure was to be recognized. In *Muncy*, supra, 163 S.W. at 35, the Court said, "The right [to grant immunity] under our law of the district attorney with the knowledge and consent of the district judge, to guarantee immunity from prosecution and punishment has never been seriously questioned in this State." The previously held rationale for such a grant has now been embodied at Art. 32.02, V.A. C.C.P. *Ex Parte Moorehouse*, 614 S.W.2d 450 (Tex.Cr.App.1981) (Clinton J., concurring).

Given this background, we turn now to the issue of the immunity agreement in the instant case. As a threshold matter we must determine what effect, if any, Ms. Zani's first partially complete statement had on the immunity agreement.

■ When a prosecutor offers a contract of immunity, the witness will be exempt from prosecution if an honest and fair disclosure of the crime is given. *Camron*, supra. The Court of Appeals suggests that, since appellant did not give a fully accurate description of the events at the very first opportunity, the agreement should be held unenforceable. We do not agree. Appellant did, prior to the trial for which she was to testify, give a *complete* statement of *exactly* what occurred on the date Mr. Dess was killed. We hold this to be compliance with the condition of immu-

nity such that the agreement was not violated.

Contrary to the State's position, the situation presented here is certainly not similar to that presented in *Ex parte Muncy*, supra. In *Muncy*, supra, the defendant had been granted immunity in order to compel his testimony before a grand jury and later in open court. When the defendant refused to testify in open court the immunity agreement was properly held null and void. The defendant thus broke the agreement precisely when it was needed to be utilized.

In the instant case there is no evidence that appellant refused to testify. Whatever effect the nature of her first partially complete statement may have had on the immunity agreement, we cannot agree that it rendered that agreement unenforceable, particularly where appellant complied fully with the terms of the agreement before the State was ready to proceed to trial against her co-defendant, Robert Zani.

Proceeding to the central issues in this case we must determine what level of proof must be met in dealing with the enforcement of immunity agreements and upon whom the burden of meeting that level of proof must be placed.

■ Initially we emphasize that the method used by theappellant in the instant case to challenge the prosecution on the basis of the immunity grant was entirely correct. Since immunity agreements seek not only to avoid convictions but to avoid prosecutions as well, it is necessary to challenge indictments in such a way as to avoid the trial itself. A Motion to Dismiss the Indictment due to a grant of immunity is such a means of challenging a prosecution prior to trial.

■ Because the central policy behind grants of immunity is the facilitation of information gathering and these grants are nothing more than contracts in which each party gains a benefit and suffers a burden, we must determine those relative benefits and burdens to ensure that each has adequately performed. In exchange for a waiver of her Fifth Amendment privilege

against self-incrimination appellant was promised that the State would avoid seeking an indictment against her or in any other way initiating prosecution, provided she did not "directly" cause the death of Dess. Such a promise necessarily includes a contract not to proceed to trial. Indeed, while immunity grants are safeguards against conviction, they are also more than that. They are safeguards against prosecution in general. In the instant case the trial court properly conducted a pre-trial hearing on the validity of the immunity agreement in order to determine the right of the State to prosecute. Thus, the State, in seeking to defeat the immunity agreement, is limited to this evidence presented prior to the actual trial. To allow, as the Court of Appeals did here, the State to present evidence attacking the conditions of the agreement at a pre-trial hearing and again at trial, and then to consider all such evidence together undermines the policy behind such agreements and, in essence, violates the agreement itself. For immunity agreements to be effective their inviolability must be jealously guarded. Because we are oftentimes dealing with criminals the temptation to prosecute will always be present. Our sense of justice is always offended when we permit a criminal to trade his information for his liberty. However, we must remember that important rights are relinquished by the informant and in many instances, as here, without the immunity agreement and subsequent testimony no evidence would exist upon which to convict the co-defendant. If we are to keep this effective, if not attractive, criminal investigatory tool viable we must make certain that its terms are strictly enforced.

In sum, there will be no trial if the immunity agreement is valid. Thus, the determination of whether the agreement is valid cannot be left for the trial itself. If the agreement is to mean anything such an issue must be conclusively decided prior to trial.

■ Turning to the issue of the proper burden of proof to be required, we do not agree with the dissenting Justice Tijerina in the Court of Appeals that immunity is a defense under the Code of Criminal Procedure. We do agree that it is analogous to one. The initial burden is on the defendant to show the existence of an agreement by a preponderance of the evidence. *Turney v. State*, 40 Tex.Cr.R. 561, 51 S.W. 243 (Tex. Cr.App.1899). In this respect it differs from ordinary defenses where the defendant is only required to raise his defense by producing some evidence. However, once the initial burden is met and the existence of an immunity agreement is shown by a preponderance of the evidence, we hold that, procedurally, immunity should be treated just like a defense under the Code.[2] Thus, the burden then shifts to the State to show beyond a reasonable doubt why the agreement is invalid or why prosecution should be allowed despite the agreement.[3]

In the instant case the existence of the agreement was not an issue. Both parties admitted that the agreement not to prosecute existed. Thus, the appellant's burden had been met. The State was then required to prove that the agreement was unenforceable. In this case the State was required to prove that appellant "directly" caused the death of Mr. Dess beyond a reasonable doubt since that was the only

**2.** Tex.Penal Code, Sec. 2.03(d) reads:
  If the issue of the existence of a defense is submitted to the jury, the court shall charge that a reasonable doubt on the issue requires that the defendant be acquitted.

**3.** To place upon the State any lesser burden creates a rather anomalous situation. For example, in the instant case, if the State was only held to a preponderance standard to prove the violation of the immunity agreement, it is quite possible that the State could produce sufficient evidence to void the agreement and thus prose-

cute, but insufficient to obtain a conviction. The State could prove by a preponderance of the evidence that appellant "directly" caused the death of Dess, but could not prove this beyond a reasonable doubt. However, they could easily prove she was a party to the offense. In such a case the State could invalidate the immunity agreement at the pre-trial hearing making it void and non-binding and then obtain a conviction for being a party to murder, an offense for which immunity was originally granted.

 

"condition" of the agreement and the one the State claimed appellant violated.

To place the burden on the appellant to prove not only that an immunity agreement was given but that it is effective offends our notions of fair play. Consistent with the nature of a defense, where the State is required to disprove the defense beyond a reasonable doubt once it has been adequately established, we hold that the State must carry the burden in the instant case. In the final analysis it must be remembered that the terms of the agreement were bargained for by the State. Appellant has performed under the agreement. Thus, if the State wants to avoid the agreement, it should be up to it to show that the agreement is unenforceable.

Further, placing such a burden on a defendant would significantly restrain the efficacy of immunity agreements. Again, who would be willing to testify under such conditions?

■ The evidence adduced at the pre-trial hearing bearing on the issue of whether appellant directly caused the death of Mr. Dess has been discussed. It consisted entirely of appellant's statement in which she expressed her belief that Dess was already dead when she fired the gun and an autopsy report describing the condition of the body but not stating the cause of death. We agree with the dissenting Justice in the Court of Appeals that the State may well have proven beyond a reasonable doubt that appellant fired a single shot. However, this is clearly insufficient because the State's burden, by the terms of the agreement itself, was to show that appellant "directly" caused the death of the victim.

Evaluating the evidence presented in the pre-trial hearing we hold that no rational trier of fact could have found that appellant "directly" caused the death of Mr. Dess beyond a reasonable doubt. Thus, the immunity agreement was valid and no prosecution was proper.

Accordingly, the judgment of the Court of Appeals affirming the trial court convic-

tion is reversed and the prosecution is ordered dismissed.