Harvey SOSSAMON, a/k/a
Mike Foster, Appellant,

v.

The STATE of Texas, Appellee.

No. 1259–87.

Court of Criminal Appeals of Texas,
En Banc.

May 8, 1991.

341

Jerald D. Crow, Conroe, for appellant.

Michael R. Little, Dist. Atty., and Steven T. Greene, Asst. Dist. Atty., Liberty, Robert Huttash, State's Atty., Austin, for State.

## OPINION ON THE STATE'S PETITION FOR DISCRETIONARY REVIEW

BAIRD, Judge.

Appellant was convicted of aggravated robbery. Tex.Penal Code Ann. § 29.03. The jury found the enhancement allegation

true and sentenced appellant to confinement for life.

On direct appeal, appellant complained of the trial court's failure to quash the indictment and suppress his confession because both were obtained pursuant to a broken promise of immunity. The Court of Appeals agreed, reversed the conviction and ordered the trial court to enter a judgment of acquittal. *Sossamon v. State*, 740 S.W.2d 543 (Tex.App.–Beaumont 1987).

We granted the State's petition for discretionary review to determine whether the Court of Appeals erred by holding that: 1) appellant was entitled to immunity from prosecution where there was no evidence of court approval of an offer of immunity made to appellant in order to obtain his confession, 2) the promises made to appellant required transactional immunity instead of use immunity, 3) the promise made to appellant was of such character that it was likely to influence appellant to speak untruthfully, and 4) the State relied on facts contained in appellant's confession although neither the confession nor its fruits were offered as evidence.

## I.

### FACTUAL SUMMARY

The facts of this case are somewhat complicated, but a factual summary is necessary to address the grounds presented in the State's petition. In May of 1985, Detective Charles L. Burks, Jr. (Burks) of the Montgomery County Sheriff's Department arrested appellant, a suspect in several Montgomery County aggravated robberies. As Burks drove appellant to jail, appellant asked if Burks had "ever traded horses." Thereafter, Burks discussed the possibility of appellant providing information in exchange for leniency.

Initially, appellant offered to provide information implicating others also responsible for the Montgomery County robberies. Later, appellant told Burks that he could provide information on aggravated robberies that occurred in other counties, if appellant could be assured that he would not be prosecuted in those other counties.

Burks contacted the Montgomery County District Attorney, James Keeshan (Keeshan), who agreed to offer appellant a sentence no greater than fourteen years on the two Montgomery County cases for which appellant stood indicted, and guaranteed that appellant would not be indicted on any of the other Montgomery County cases.

Burks contacted authorities in Harris and McLennan Counties and told them that appellant would provide information in exchange for not being prosecuted. Two Houston Police Department detectives came to Montgomery County and told Burks that the Harris County District Attorney's Office agreed to the deal. Texas Ranger Joe Wiley expressed similar agreement on behalf of McLennan County. Appellant cooperated with those officials and was not prosecuted in either Harris or McLennan Counties.

Burks telephoned Detective Larry Allen (Allen) of the Liberty County Sheriff's Office and informed Allen that appellant could provide information on a Liberty County aggravated robbery case in exchange for a promise of immunity from prosecution. Allen indicated that he would have to contact a member of the Liberty County District Attorney's Office. According to Burks, Allen later informed him that Assistant Liberty County District Attorney Steve Greene (Greene) stated that "everything was fine, to go ahead and take the man's statement." Burks told appellant that the Liberty County Sheriff's Department agreed to grant immunity in exchange for information on the offense. Thereafter, appellant gave the complained of confession to Burks implicating himself and the others involved in the instant case. Burks understood that appellant would not be prosecuted for the offense revealed in appellant's confession. Burks gave appellant's confession to Allen, who, advised Burks that appellant would not be prosecuted. Upon learning of the Liberty County indictment against appellant, Burks telephoned Allen to ask why the agreement was breached. Allen responded that he did not know.

Allen disputed Burks' assertion that Greene had accepted the agreement not to prosecute. According to Allen, the Liberty County District Attorney's Office never said the deal was acceptable; rather, the District Attorney's Office told Allen to have the Montgomery County District Attorney's Office contact the Liberty County District Attorney's Office.[1] Allen testified that he told Burks the agreement was acceptable with the Liberty County Sheriff's Department, but that Burks needed to contact the Liberty County District Attorney's Office for approval. However, Allen believed a deal would be consummated.

Greene also disputed Burks regarding Liberty County's acceptance of the agreement. Greene testified that he never informed either Burks or Allen that appellant would be immune from prosecution.

Lastly, appellant testified that Burks made the promise of immunity, and that he would not have confessed if there had not been the agreement of immunity from prosecution.

Although the trial court held that appellant's confession was admissible, the State did not introduce the confession into evidence; appellant was convicted upon the eyewitness testimony of the aggravated robbery victim. The State argues that no fruits of the confession were used to procure the conviction. The Court of Appeals concluded that appellant's confession was inadmissible and that public policy mandated an acquittal, notwithstanding the fact that the confession was never admitted at trial. *Sossamon,* 740 S.W.2d at 545.

## II.

### IMMUNITY

We must determine whether, under the above stated facts, there was a valid, enforceable contract for immunity.[2] The State contends that the Court of Appeals erred in concluding that appellant was entitled to immunity because the trial court, having jurisdiction over the case, did not approve of the agreement.

The doctrine of contractual immunity was thoroughly addressed in *Zani v. State,* 701 S.W.2d 249 (Tex.Cr.App.1985). Therein we recognized the distinction between immunity which requires the trial court participation in order to compel the testimony of a witness, *Ex parte Muncy,* 72 Tex. Cr.R. 541, 163 S.W. 29 (1914), and immunity based upon a contractual arrangement between the accused and the appropriate prosecutorial authority. Under the latter theory, when a prosecutor offers a contract of immunity and the accused fulfills his obligation under the contract he will be exempt from prosecution. *Zani,* 701 S.W.2d at 253.

The central issue in *Zani* was the level of proof required when dealing with the enforcement of an immunity agreement and the allocation of the burdens of proof:

> Turning to the issue of the proper burden of proof to be required, we do not agree ... that immunity is a defense under the Code of Criminal Procedure. We do agree that it is analogous to one. The initial burden is on the defendant to show the existence of an agreement by a preponderance of evidence. (Citation omitted.) ... [O]nce the initial burden is met and the existence of an immunity agreement is shown by a preponderance of the evidence, we hold that, procedurally, immunity should be treated just like a defense under the Code. Thus, the burden then shifts to the State to show beyond a reasonable doubt why the

1. Peter Speers, then a Montgomery County Assistant District Attorney, testified that he probably attempted to contact the Liberty County District Attorney's Office, but never actually spoke with anyone regarding appellant's cases. Greene testified that he received a message that Speers had telephoned, but Greene never returned the phone call. Keeshan testified that he never contacted the Liberty County District Attorney's Office.

2. While there is no statute specifically granting the prosecutor the power to grant immunity from prosecution under these circumstances, that power is derived from Art. 32.02 Tex.Code Crim.Proc.Ann., which grants a prosecutor authority to dismiss prosecutions with court approval. *Morehouse v. State,* 614 S.W.2d 450, 453 n. 3 (Tex.Crim.App.1981) (Clinton, J. concurring).

agreement is invalid or why prosecution should be allowed despite the agreement. (Footnotes omitted.)

*Zani,* 701 S.W.2d at 254.

In the instant case, the record is clear that an agreement for immunity from prosecution was entered into between appellant and the Montgomery County Sheriff's Department. However, Allen related that the Liberty County Sheriff's Department was willing to not prosecute and that the Liberty County District Attorney's Office was receptive to such an agreement and advised Burks to finalize the agreement through the Montgomery and Liberty County District Attorney's Offices. Based upon the record before us, there is no question that: 1) appellant believed that a contract for immunity had been reached between all the pertinent parties, 2) based upon this belief appellant gave the complained of confession, 3) Burks gave appellant's confession to Allen, and 4) the Liberty County Sheriff's and District Attorney's Offices utilized the statement to solve the instant offense.[3]

Appellant believed that an agreement for immunity from prosecution had been consummated between himself and Montgomery and Liberty Counties. This belief, while relevant to the determination of whether appellant's confession was voluntary, *infra,* would not bind Liberty County to an agreement for immunity if Liberty County did not enter into the agreement.

■ Turning to the standard established in *Zani,* 701 S.W.2d 249, to determine

whether an immunity agreement existed, there is no evidence to demonstrate that appellant entered into an immunity agreement with the *Liberty County District Attorney's Office. Id.,* 701 S.W.2d at 253 (when a *prosecutor* offers a contract of immunity, the witness will be exempt from prosecution if an honest and fair disclosure is given). Appellant's dealings, as far as they related to the Liberty County offense, were exclusively with Burks of the Montgomery County Sheriff's Department, who dealt exclusively with Allen of the Liberty County Sheriff's Department. A rational trier of fact could have found that appellant entered into an agreement with Montgomery County, but, since there was no evidence to show an agreement with the Liberty County's District Attorney's Office, no rational trier of fact could have found an enforceable contract for immunity from prosecution. Contrast *Zani,* 701 S.W.2d at 253–254. Simply stated, appellant failed to establish by a preponderance of the evidence the existence of an immunity agreement with the Liberty County District Attorney. Accordingly, we sustain the State's first and second grounds for review and find that the Court of Appeals erred by holding appellant was entitled to immunity.

### III.

### CONFESSION

■ Our inquiry does not end with the determination that no valid contract of im-

---

**3.** With respect to Liberty County's use of appellant's statement, it is uncontested that Liberty County had no suspects and no leads in the crime. There were no fingerprints found at the scene of the crime. There was no other physical evidence linking either appellant or his companions to the offense. Additionally, neither of the victims had given written statements to the authorities, although Detective Allen had interviewed them shortly after the offense.

Based solely on the information in appellant's confessions, Liberty County authorities were able to arrest another of the participants in the crime, Darren Rene Williams. Additionally, based solely on appellant's statements, three other individuals were inculpated in the Liberty County offense. One of whom, David Scott Delano, gave Montgomery County a statement.

Following his arrest, Darren Rene Williams gave a statement to Liberty County officials. Both Williams' and Delano's statements coincided factually with Sossamon's statements regarding the Liberty County offense. Detective Burks candidly admitted that had it not been for appellant's statements, Burks "would not have known who (these individuals) were."

Detective Allen was the only witness called before the Grand Jury on appellant's indictment. He testified that he was certain that the Grand Jury considered appellant's statement in returning the indictment. Additionally, shortly before the trial, the complaining witness viewed a photographic line up and positively identified appellant. Even the picture of appellant and his connection to the victim for the purposes of the line up were established solely due to appellant's confession.

munity existed. If appellant's confession was involuntarily obtained, it would have been error for either the confession or evidence obtained therefrom to be admitted at trial. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

## A.

■ A four-prong test must be met in order to render a confession obtained by a promise of a benefit involuntary. *Fisher v. State*, 379 S.W.2d 900 (Tex.Crim.App.1964). The promise must be: 1) of some benefit to the defendant, 2) positive, 3) made or sanctioned by a person in authority, and 4) of such character as would be likely to influence the defendant to speak untruthfully. *Fisher*, 379 S.W.2d at 902. See also *Washington v. State*, 582 S.W.2d 122, 124 (Tex. Crim.App.1979).

The State limits its arguments to the fourth prong: whether the promise was likely to influence the defendant to speak untruthfully. We conclude that the first three prongs were met; the promise was clearly of some benefit to appellant, it was "positive," *Washington*, 582 S.W.2d at 124, (unequivocal and definite), and it was made by a person in authority, *Hardesty v. State*, 667 S.W.2d 130 (Tex.Crim.App.1984) (law enforcement officers in a position of "authority" in this context). Therefore, we turn to the fourth prong articulated in *Fisher*, 379 S.W.2d at 902.

■ The Court of Appeals concluded that the promise of benefit in this case was likely to influence appellant to speak untruthfully. *Sossamon*, 740 S.W.2d at 545. To reach that determination, an appellate court must look to whether the circumstances of the promise made the defendant "inclined to admit a crime he had not committed." *Fisher*, 379 S.W.2d at 902.

We analyzed the fourth prong in *Washington*, 582 S.W.2d at 124, where the defendant, whose trial had proceeded as far as voir dire, entered into plea negotiations which provided that if he confessed he would be allowed to take a polygraph ex-

amination. If he told the truth on the examination, the confession would be set aside and he would be granted a new trial. We held that under those circumstances the fourth prong was met because "a person intending to tell the truth on the exam would have nothing to lose by confessing, but would have the possibility of the ultimate gain of having the charges dismissed." *Id.* The Court then distinguished the defendant's case from that of a usual plea bargain situation:

> This case differs importantly from the usual plea bargain situation in which the defendant accepts a sure conviction with whatever accompanying punishment in exchange for a guilty plea. While we do not say that such a plea bargain would never come within the test of *Fisher*, we presume that a defendant would be much less likely to admit to a crime not performed when he is faced with a sure conviction, albeit a less serious conviction than the offense charged. [The defendant], however, faced a situation in which a truthful polygraph examination would result in no worse of a position for himself than prior to the confession, but could potentially secure his release. Such circumstances would very likely amount to an irresistible pressure to sign a confession even though the defendant is innocent.

*Ibid.*

■ In the case at bar, the record reflects that appellant was promised immunity from prosecution for information regarding crimes in which he was involved. Just as the defendant in *Washington*, 582 S.W.2d 122, appellant had nothing to lose and everything to gain whether or not his confession was truthful. Additionally, cooperation with the authorities in McLennan, Harris and Liberty Counties promised a reduction in the amount of time to be served on the Montgomery County cases.[4] Therefore, we agree with the Court of Appeals' conclusion that the fourth prong of

---

**4.** Specifically, District Attorney Speers testified that due to appellant's ongoing cooperation, the Montgomery County District Attorney's office would offer appellant somewhere between eight and ten years, or possibly less, something in "single-digit numbers."

*Fisher* was met and appellant's confession was involuntary.

### B.

As appellant's confession was not admitted at trial, we must determine whether the fruits of the confession were used against appellant. The record reflects that appellant was convicted solely upon the testimony of the complainant and his wife who identified appellant in court as a member of a group of men who robbed the complainant. Appellant submits that his identification must be suppressed because it was derived from the involuntary confession. The State concedes that: 1) prior to appellant's confession there were no suspects or leads for the Liberty County offense, 2) based upon the information obtained from appellant's confession, Liberty County was able to arrest other individuals involved in the offense, and 3) the State obtained confessions from those individuals concerning other aggravated robberies.[5]

The indirect fruits of an illegal search or arrest should be suppressed where they bear a sufficiently close relationship to the underlying illegality. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The exclusionary rule is not limited to Fourth Amendment violations; it has also been applied to violations of the Fifth Amendment, *Murphy v. Waterfront Commission of New York Harbor*, 378 U.S. 52, 77–78, 84 S.Ct. 1594, 1608–09, 12 L.Ed.2d 678 (1962) and the Sixth Amendment, *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149.[6] The exclusionary rule "has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons," *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 3047, 49 L.Ed.2d 1067 (1976), rather, the "application of the rule has been restricted to those areas where its remedial

objectives are thought most efficaciously served." *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974). The penalties assessed against the State because its officers have violated the law must bear some relation to the purpose which the law is to serve.

In *Pichon v. State*, 683 S.W.2d 422 (Tex. Crim.App.1984), we held the in court identification of a defendant who was arrested in violation of the Fourth Amendment was not excludable as tainted evidence. That holding was based largely upon *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) where the complainant was robbed at gunpoint by a young man in the women's restroom on the grounds of the Washington Monument. After receiving two other identical complaints three days after the first assault, the Park Police questioned the defendant who matched the robber's description and whom had been observed in the restroom area. The police detained the defendant after a tour guide identified him as the man he had seen at the monument on the day of the first robbery. The police took the defendant into custody for approximately one hour, ostensibly for truancy, and photographed him. The first robbery victim thereafter identified the defendant from the photograph and subsequent lineup. The Supreme Court held the products of the arrest, the photographic and lineup identifications, were inadmissible at trial because the arrest was pretextual. However, the Court permitted the in-court, identification:

A victim's in-court identification of the accused has three distinct elements. First, the victim is present at trial to testify as to what transpired between her and the offender, and to identify the defendant as the culprit. Second, the victim possesses knowledge of and the ability to reconstruct the prior criminal

---

**5.** See supra, n. 3.

**6.** The exclusionary rule is not without exceptions. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (Fourth Amendment exclusionary rule does not bar admission of evidence seized in reasonable, good-

faith reliance on a search warrant that is subsequently held to be defective); *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (inevitable discovery doctrine); *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (public safety exception).

occurrence and to identify the defendant from her observations of him at the time of the crime. And third, the defendant is also physically present in the courtroom, so that the victim can observe him and compare his appearance to that of the offender. In the present case, it is our conclusion that none of these three elements 'has been come at by exploitation' of the violation of the defendant's Fourth Amendment rights.

*Crews,* 445 U.S. at 471, 100 S.Ct. at 1250 (citation omitted).

The fact situation in the case at bar is distinguishable from *Crews* because the police found Crews, who met the description of the assailant, at the scene of the repeated robberies. He was a suspect in the robbery; his presence was identified at the scene of the first robbery. The police impermissibly held him for one hour and obtained his photograph. All this occurred within a week of the 'first robbery.

Appellant's case involves an in court identification stemming from a violation of appellant's Fifth Amendment right against self-incrimination rather that a violation of the Fourth Amendment. Prior to appellant's confession, there were no suspects or leads in the Liberty County offense. There was no physical evidence tying appellant or his cohorts to the crime. None of the other participants were suspects in the crime. It was several months after the Liberty County robberies that the authorities in Montgomery County obtained the involuntary confession which admitted to the robbery and provided suspects for the crime. Therefore, this case is radically different from the fact scenario in *Crews.*

██ Given these distinctions, we must answer the following question: Does the State's use of appellant's involuntary confession to match appellant with a crime for which there were no suspects or leads, which ultimately lead to an otherwise valid in court identification of appellant, violate his right against self-incrimination? [7] If so, does the violation require that identification be suppressed?

**7.** The Fifth Amendment became applicable to the states through the Fourteenth Amendment

A section of the "lead" opinion in *Crews,* which in fact failed to garner a majority of the Supreme Court members, leaves open the question whether the in court identification of the defendant would be subject to suppression had the defendant not already been a suspect:

> We need not decide whether *respondent's person* should be considered evidence, and therefore a possible "fruit" of police misconduct. For in this case the record plainly discloses that prior to his illegal arrest, the police both knew respondent's identity and had some basis to suspect his involvement in the very crimes with which he was charged. Moreover, before they approached respondent, the police had already obtained access to the "evidence" that implicated him in the robberies, i.e., the mnemonic representations of the criminal retained by the victims and related to the police in the form of their agreement upon his description. *In short, the Fourth Amendment violation in this case yielded nothing of evidentiary value that the police did not already have in their grasp* (footnote 22).
>
> (footnote 22) Thus we are not called upon in this case to hypothesize about whether routine investigatory procedures would eventually have led the police to discover respondent's culpability. *His involvement in the robberies was already suspected, and no new evidence was acquired through the violation of his Fourth Amendment rights.*

*Crews,* 445 U.S. at 475 and n. 22, 100 S.Ct. at 1252 and n. 22 (emphasis added).

Another section of the *Crews* opinion, with which the Court *unanimously agreed,* distinguished the *Crews* scenario from one in which the *victim's* presence in the courtroom stemmed from police misconduct.

> In this case, the robbery victim's presence in the courtroom at respondent's trial was surely not the product of any police misconduct ... Thus this is not a

in *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

case in which the *witness' identity* was discovered or her cooperation secured only as a result of an unlawful search or arrest of the accused.

(footnote 15.) Here the victim's identity was known long before there was any official misconduct, and her presence in court is thus not traceable to any Fourth Amendment violation.

*Crews*, 445 U.S. at 471–72 and n. 15, 100 S.Ct. at 1250 and n. 15, citing generally at n. 15 Ruffin, *Out on a Limb of the Poisonous Tree: The Tainted Witness*, 15 UCLA L.Rev. 32 (1967).

In the case at bar, the complainant's identity and presence in court was directly attributable to appellant's involuntary confession. Liberty County acknowledges that it had no suspects, no leads and no physical evidence until Montgomery County obtained appellant's confession.[8] While appellant's face may not be suppressed because of police misconduct that violated the Fourth Amendment, *Crews*, 445 U.S. at 478–79, 100 S.Ct. at 1253–54 (Powell, Blackmun, JJ., concurring) (White, J., Burger, P.J., Rehnquist, J., concurring), the witnesses's in court testimony should be excluded if it stems from a Fifth Amendment violation. We see a distinction between improperly seizing an individual to bring him into court and using an involuntary confession to search for victims of crimes committed months prior to obtaining the involuntary confession.[9]

In *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978),

the Supreme Court conducted an attenuation analysis of an improper search which led the police to a witness who ultimately testified against the defendant. A police officer was visiting a friend at her place of employment, when he inadvertently discovered an envelope containing money and betting slips. The officer asked his friend to whom the envelope belonged. The woman, who did not know that the envelope belonged to the defendant, her boss, and that he had instructed her to give it to someone. The police officer gave this information to the F.B.I., who had the business under surveillance for a year prior to the discovery of the envelope. While the defendant was not under surveillance at the time the envelope was discovered, the investigation had continued to a lesser degree. The defendant was summoned before a federal grand jury where he testified that he had never taken bets. The following week, the employee testified to the contrary. The defendant was subsequently indicted for perjury.

At trial, the witness's testimony was suppressed as "a fruit of the poisonous tree" and the Court of Appeals agreed. The Supreme Court specifically declined to adopt a per se rule that the testimony of a live witness should *not* be excluded at trial no matter how close and proximate the connection between it and a violation of the Fourth Amendment. *Id.*, 435 U.S. at 275–275, 98 S.Ct. at 1059. Instead, the Court focused on an attenuation analysis and reversed the lower courts' holdings:

---

8. See supra n. 3.

9. Historically, the United States Supreme Court has afforded greater protection to certain classes of rights which are "so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). See generally, Campbell, *An Economic View of Developments in the Harmless Error and Exclusionary Rules*, 42 Baylor L.Rev. 499, 516–21 (1990).

The Supreme Court has typically afforded Fifth Amendment rights greater protection than Fourth Amendment rights. See and contrast, *Price v. Georgia*, 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970) (harmless error cannot apply to violations of the Double Jeopardy Clause

of the Fifth Amendment); *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (harmless error cannot apply to coerced confessions), with *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (good faith exception to Fourth Amendment exclusionary rule); *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (inevitable discovery exception to Fourth Amendment exclusionary rule); *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (public safety exception to Fourth Amendment exclusionary rule). However, this may be changing. See and c.f., *Arizona v. Fulminante*, —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (plurality opinion) (harmless error can apply to improperly induced confession).

While the particular knowledge to which [the witness] testified at trial can be logically traced back to [the officer's] discovery of the policy slips, both the identity of [the witness] and her relationship with the [defendant] *were well known* to those investigating the case. There is, in addition, not the slightest evidence to suggest that [the officer] entered the shop or picked up the envelope with the intent of finding tangible evidence bearing on an illicit gambling operation, much less any suggestion that he entered the shop and searched with the intent of finding a willing and knowledgeable witness to testify against respondent. Application of the exclusionary rule in this situation could not have the slightest deterrent effect on the behavior of an officer such as [the officer involved]. The cost of permanently silencing [the witness] is too great for an evenhanded system of law enforcement to bear in order to secure such a speculative and very likely negligible deterrent effect.

*Ceccolini*, 435 U.S. at 279–80, 98 S.Ct. at 1062.

### C.

#### Attenuation

The attenuating factors present in *Ceccolini* are absent from the case at bar. The Montgomery County authorities interviewed appellant with the stated intention of obtaining information about appellant's participation in criminal activities, along with the express promise that appellant would not be prosecuted in Liberty County for any offenses to which he confessed. As previously stated, the witnesses were found only as a result of the improperly induced confession; it is undisputed that there were no leads to the crime which was committed months before in a different county. The nexus between the witnesses and appellant's improperly induced confession is direct and unattenuated. In the instant case, application of the exclusionary rule would serve a very valid purpose: prohibiting authorities from obtaining confessions by unkept promises of immunity and subsequently using the confessions to connect a defendant with a crime victim.

The Fifth Amendment cannot countenance an otherwise valid in court identification of a defendant where the police locate the complainant *solely* through an involuntary confession. While the in court identification, itself, may be based on a recollection preceding the police misconduct, the witnesses's presence in the courtroom stems directly from the involuntary confession.

In the case at bar, as stated previously, the State obtained an involuntary confession based upon false promises of immunity; appellant's right against self-incrimination was violated. The State must establish that the evidence presented against appellant was not tainted by the violation of appellant's right against self-incrimination. The Liberty County officials readily acknowledged they had no suspects in the crime until appellant's confession which was obtained six months after the Liberty County offense. The State failed to demonstrate that the obtaining of the witnesses against appellant in Liberty County was derived independently, or would have been obtained inevitably, from the violation of appellant's right against self-incrimination. Without this showing, we are compelled to conclude that the witnesses's presence in the courtroom which led to the identification of appellant should have been suppressed at trial pursuant to appellant's Fifth Amendment right against self-incrimination. The State's third and fourth grounds for review are overruled.

The judgment of the Court of Appeals is reversed insofar as it orders an acquittal and the cause is remanded to the trial court.

MALONEY, J., dissents to part II and concurs to the result reached in part III.

BENAVIDES, J., concurs in the result.

MILLER, Judge, dissenting.

Justice Brookshire is correct in his dissenting opinion in the Court of Appeals below. *Sossamon v. State*, 740 S.W.2d 543

**350**

(Tex.App.–Beaumont 1987). Therein he says

"Appellant's argument on appeal is that the police took advantage of his confession to bring him into court where the victims of the crime identified him as one of three men who robbed them at gunpoint. Therefore, it is clear that Appellant seeks to have this court suppress the identity evidence as the tainted fruit of an illegally-obtained confession. *It is not the fruit of any confession, because the victims knew the "face" or "identity information" immediately after the crime as to who assaulted them long before the confessions were made.*"

(Emphasis added.)

At this point I could go into an analysis counter to the majority's analysis of *Pichon v. State*, 683 S.W.2d 422 (Tex.Cr.App. 1984), *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), etc. but I shall not. The majority looks with blinders to the third element of in-court identification as set out in *Pichon* (to-wit that the defendant is physically present in the courtroom) because this defendant was physically present in the courtroom solely because he gave a confession which was admittedly involuntary under *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) and *Fisher v. State*, 379 S.W.2d 900 (Tex.Cr.App.1964). Having re-evaluated *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), I simply cannot imagine that even the 1963 United States Supreme Court contemplated an event such as this to be encompassed within the "fruit of the poison tree" doctrine.

Therefore, I dissent to part III–B of the majority opinion.