IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 080-03






CHARLES DEWAYNE THORNTON, Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE SECOND COURT OF APPEALS


 TARRANT COUNTY






 Hervey, J., delivered the opinion of the Court in which Keller, PJ.,
Meyers, Keasler, and Holcomb, JJ., joined. Price, J., filed a concurring opinion.

Womack, J., filed a concurring opinion in which Johnson and Cochran, JJ., joined. 



O P I N I O N 




 The issue in this case is whether, as a matter of federal constitutional exclusionary rule
jurisprudence, derivative evidence that is the product of an illegal arrest in another state should be
suppressed in a Texas prosecution. We decide that the evidence is not suppressible in the Texas
prosecution.

 Appellant was charged with and convicted of burglary of a habitation with the intent to commit
sexual assault (the "charged offense"). The victim of this offense testified that on November 30, 1999, she
was awakened in the middle of the night in the bedroom of her apartment by a tug on her pubic hair. She
saw a man who "fit appellant's silhouette" leaving the bedroom. The victim's husband woke up and saw
an intruder standing in the bedroom doorway. The intruder left with a pair of the victim's panties. The
police subsequently recovered these panties from appellant's mother's apartment. Neither the victim nor
her husband could identify appellant as the intruder. Through cross-examination and closing arguments,
appellant suggested, among other things, that "the intruder" may have been in the victim's apartment to steal
her panties and not to commit sexual assault.

 To prove appellant's intent to commit sexual assault, the prosecution presented, as part of its case-in-chief under Tex.R.Evid. 404(b), evidence of a similar offense that appellant committed in Arizona in
April 1995 before he moved to Texas. (1) The victim of the Arizona offense testified in the Texas prosecution
that someone (whom she could not identify) broke into her apartment and sexually assaulted her. This
person took a pair of the Arizona victim's panties. The Texas prosecution proved beyond a reasonable
doubt that appellant committed the Arizona offense by comparing legally-obtained-in-Texas DNA samples
of appellant to legally-obtained DNA samples in a rape kit that the Arizona victim had submitted soon after
she was attacked. (2) This comparison evidence proved that the Arizona rape kit contained appellant's DNA.

 Appellant claimed at trial, as he does here, that the Arizona extraneous offense (which appellant
had been charged with in Arizona) should not have been admitted into evidence in the Texas prosecution
because the Arizona extraneous offense "had been suppressed by the Arizona courts." The facts relevant
to this claim show that in 1995 Arizona police were investigating a series of crimes that involved someone
(known as the "midtown rapist") breaking into the homes of females, sexually assaulting them and stealing
their panties.

 From what we can glean from the transcript of the Arizona suppression hearing, it appears that the
police had reason to conduct and were conducting surveillance of a particular apartment complex as part
of their investigation of these crimes when they saw appellant walk into the complex, look around,
"disappear for a few seconds, and then turn around and walk straight back out of the complex." The
Arizona police arrested appellant because he "matched the general description" of "the man that they were
surveilling for." The Arizona police subsequently obtained appellant's blood and DNA samples which
matched the DNA samples in the Arizona victim's rape kit. At the time of the suppression hearing, the
Arizona officer who arrested appellant was no longer with the force and had moved to Oregon. 

 Claiming at the Arizona suppression hearing that only a "Terry stop was legitimate," (3) appellant's
Arizona counsel claimed that appellant's arrest was illegal because it was not supported by probable cause. 
The Arizona trial court agreed and suppressed the "blood/DNA test" as the fruit of appellant's illegal arrest. 
Also finding that there was "no other untainted evidence upon which to proceed," the Arizona trial court
"reluctantly" dismissed the Arizona case. Arizona prosecutors did not have this ruling reviewed on appeal.

 Based on our review of the transcript from the Arizona suppression hearing, it appears that
appellant was not identified by Arizona authorities as a suspect in the Arizona cases until he was illegally
arrested by the Arizona police. It also appears that Texas authorities learned of appellant's identity as the
perpetrator of the Arizona offense and as a possible suspect in similar offenses being committed in Texas
as a result of a tip from Arizona authorities on December 7, 1999. (4) Texas authorities arrested appellant
in Texas on December 17, 1999, as he tried to escape from the balcony of an apartment where he had
been seen peeking through a window by the female occupant. The police were at this location as a result
of a 9-1-1 call from the female occupant of the apartment and not as a result of the tip from the Arizona
authorities. This December 17, 1999, incident was the other extraneous offense that the prosecution used
to prove appellant's intent in the charged offense in the Texas prosecution. See Footnote 1. The actual
"blood/DNA" evidence that was suppressed in the Arizona case was not used at trial in the Texas
prosecution. See United States v. Janis, 96 S.Ct. 3021, 3023-25, 3029 (1976) (tainted primary
evidence seized by state law enforcement officer suppressible at state and federal criminal trials). 

 Appellant claimed on direct appeal that the Texas prosecution "improperly used the appellant's
identity that was a by product of the illegal arrest in Arizona as a basis for making the case in Texas." The
Court of Appeals, however, addressed a different issue and decided that appellant's Fourth Amendment
exclusionary rule objections were properly overruled because "the trial court did not admit into evidence
the illegally obtained [blood/DNA evidence] from the Arizona case." See Thornton v. State, No. 2-01-152-CR, slip op. at 6 (Tex.App.-Fort Worth, delivered December 12, 2002). We exercised our
discretionary review authority to address the question of whether the Court of Appeals erred "in approving
admission of an extraneous offense that had been suppressed by the Arizona courts." (5) 

 Although the appellant's brief does not make it very clear, his claim seems to be that the evidence
of the results of comparing appellant's legally-obtained-in-Texas DNA samples to the legally-obtained
DNA samples in the Arizona rape kit ("comparison evidence") should have been suppressed because this
evidence was the fruit of the authorities' knowledge of appellant's identity which was a "by product of the
illegal arrest in Arizona." Appellant argues in his brief:

 Contrary to Fourth Amendment doctrine, the State, in this case, improperly used
[appellant's] identity that was a by product of the illegal arrest in Arizona as a basis for
making the case in Texas. Again, the Arizona documentation clearly establishes that
[appellant] was illegally arrested; therefore, the State of Texas is prohibited from using
[appellant's] identity to resurrect this prosecution. [Citations to record omitted] In other
words, the only way Arizona officers established that [appellant] was a suspect was based
on an illegal arrest.

 

 The United States Supreme Court's Fourth Amendment "fruit of the poisonous tree" exclusionary
rule jurisprudence makes clear that not all evidence is "fruit of the poisonous tree" simply "because it would
not have come to light but for the illegal actions of the police." See Wong Sun v. United States, 83 S.Ct.
407, 417 (1963). The "more apt question" is "whether, granting establishment of the primary illegality, the
evidence ... has been come at by exploitation of that illegality or instead by means sufficiently distinguishable
to be purged of the primary taint." See id. The Supreme Court summarized its Fourth Amendment
exclusionary rule jurisprudence with respect to unlawful searches/seizures in Murray v. United States, 108
S.Ct. 2529, 2533 (1988):

 The exclusionary rule prohibits introduction into evidence of tangible materials seized during
an unlawful search, [citation omitted], and of testimony concerning knowledge acquired
during an unlawful search, [citation omitted]. Beyond that, the exclusionary rule also
prohibits the introduction of derivative evidence, both tangible and testimonial, that is the
product of the primary evidence, or that is otherwise acquired as an indirect result of the
unlawful search, up to the point at which the connection with the unlawful search becomes
"so attenuated as to dissipate the taint," [citations omitted].


 This jurisprudence also recognizes that "unbending application of the exclusionary sanction to
enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge
and jury." See United States v. Leon, 104 S.Ct. 3405, 3412 (1984). Because of its substantial
interference with the criminal justice system's truth-finding function, the application of the exclusionary rule
should be "restricted to those areas where its remedial objectives [of deterring future unlawful police
conduct] are thought most efficaciously served." See Leon, 104 S.Ct. at 3412-13; New York v. Harris,
110 S.Ct. 1640, 1645 (1990) (Marshall, J., dissenting) (because deterrence is a principal purpose of the
exclusionary rule, the attenuation analysis must be driven by an understanding of how extensive exclusion
must be to deter Fourth Amendment violations). (6)

 Primarily because the Arizona police did not learn of appellant's identity until they illegally arrested
him, it is fairly debatable whether there is a causal connection between the comparison evidence and
appellant's illegal arrest in Arizona since this derivative evidence could not have been secured without this
illegal arrest. See Sossamon v. State, 816 S.W.2d 340, 347-48 (Tex.Cr.App. 1991) (crime victim's in-court identification of defendant was fruit of poisonous tree because this evidence discovered only as a
result of defendant's illegal confession); compare United States v. Crews, 100 S.Ct. 1244, 1250-51
(1980) (maj. op.) (7) (witness' in-court identification not fruit of poisonous tree because witness' identity not
discovered and her cooperation not secured only as a result of an unlawful search or arrest of the accused). 
But, deciding that there is a causal connection between the comparison evidence and appellant's illegal
arrest in Arizona does not end the inquiry of whether this evidence is a suppressible fruit of that illegal
arrest. See Murray, 108 S.Ct. at 2533 (exclusionary rule requires exclusion unless the unlawful arrest
becomes "so attenuated as to dissipate the taint"); Sossamon, 816 S.W.2d at 349 (addressing whether
attenuating factors were present to dissipate the taint of an illegal confession).

 In this case, there are attenuating factors that dissipate the taint of appellant's illegal arrest from any
derivative evidence that may have been obtained as a result of it. There is the passage of over four years
between the illegal arrest and the acquisition of the comparison evidence in the Texas prosecution. See
Brown v. Illinois, 95 S.Ct. 2254, 2261-62 (1975) (temporal proximity between illegal arrest and voluntary
confession is relevant consideration in determining whether taint of illegal arrest has been dissipated).

 Also, there is the intervening circumstance of appellant's commission of similar crimes in Texas after
the exclusionary rule was applied in Arizona, allowing him to escape prosecution for his crimes there,
resulting in more crime victims in Texas. (8) See Brown, 95 S.Ct. at 2262 (presence of intervening
circumstances is also relevant). The most important consideration is that Texas authorities (against whom
appellant seeks application of the exclusionary rule) did not violate appellant's Fourth Amendment rights. 
See Brown, 95 S.Ct. at 2262 (purpose and flagrancy of official misconduct are also relevant
considerations); see also Leon, 104 S.Ct. at 3412 (when police have acted in objective good faith or their
transgressions have been minor, the magnitude of the benefit conferred on guilty defendants by application
of the exclusionary rule offends the basic concepts of the criminal justice system). The primary objects of
the exclusionary rule in this case are the Arizona authorities who illegally arrested appellant. Janis, 96 S.Ct.
at 3029 (primary objects of exclusionary rule sanction are those who violate the defendant's rights)

 Application of the exclusionary rule in the Texas prosecution would have "marginal or nonexistent"
benefits of deterring Texas and Arizona authorities from committing Fourth Amendment violations. See
Leon, 104 S.Ct. at 3412 (marginal or nonexistent deterrent benefits produced by suppressing evidence
obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify
substantial costs of exclusion). The remedial objectives of the exclusionary rule are most efficaciously
served by having applied it to the Arizona prosecution and not by applying it to the Texas prosecution. See
Leon, 104 S.Ct. at 3412-13 (because of its substantial interference with the criminal justice system's truth-finding function, the application of the exclusionary rule should be "restricted to those areas where its
remedial objectives are thought most efficaciously served"); Janis, 96 S.Ct. at 3029.

 Finally, appellant also appears to argue that his identity should be suppressed as a by-product of
his illegal arrest in Arizona. In Crews, Justice Brennan's lead plurality opinion, in a case similar to this one,
attempted to leave open the question of whether a defendant's "person [c]ould be considered evidence,
and therefore a possible 'fruit' of police misconduct." See Crews, 100 S.Ct. at 1252 (Brennan, J., joined
by Stewart and Stevens, JJ.) (plurality op.). (9)

 A majority of the Supreme Court in Crews, however, rejected the claim that "a defendant's face
can be a suppressible fruit of an illegal arrest." See Crews, 100 S.Ct. at 1253 (Powell, J., concurring in
part, joined by Blackmun, J.) and also at 1253 (White, J., concurring in the result, joined by Burger, C.J.,
and Rehnquist, J.); see also Sossamon, 816 S.W.2d at 348 (defendant's face may not be suppressed
because of police misconduct that violated the Fourth Amendment). (10) Even if these concurring opinions
(reflecting a majority view) in Crews cannot be considered as having rejected the claim that "a defendant's
face can be a suppressible fruit of an illegal arrest," Justice Brennan's lead opinion is only a plurality opinion
and cannot be considered as binding precedent.

 The judgment of the Court of Appeals is affirmed.


 Hervey, J.

Delivered: September 22, 2004

Publish

1. The prosecution also presented evidence of another similar offense that appellant committed in
Texas on December 17, 1999. The parties' briefs address whether the trial court abused its discretion to
admit this evidence and evidence of the 1995 Arizona offense under Rule 404(b) and Tex.R.Evid. 403. 
Appellant did not raise these claims in his discretionary review petition, and we did not exercise our
discretionary authority to address them. They are, therefore, not before the Court. 
2. In a March 2001 search warrant affidavit seeking DNA samples from appellant, Texas authorities
stated that they needed these samples for DNA testing of biological material in the Texas victim's
underwear and for DNA testing of biological material in the Arizona victim's rape kit. 
3. See generally Terry v. Ohio, 88 S.Ct. 1868 (1968).
4. In a December 20, 1999, search warrant affidavit for the apartment of appellant's mother seeking
evidence in the charged offense and in another extraneous offense committed on November 15, 1999,
Texas authorities stated:


 On 12-7-99 your affiant had received a tip of similar circumstances from Tucson Arizona. 
Your affiant made contact with [Arizona] Detective Ralph Taylor. Your affiant was told
that [appellant] had been handled several times for similar offenses. Detective Taylor
advised that he had heard about the several offenses in [Texas] involving the unknown
suspect entering apartments, and touching or looking at females. Detective Taylor told me
that [appellant] liked to hide in the dark, watch women, enter the apartments and touch the
victim, lick her genital area, and when she would wake up, he would laugh at her, and
leave the apartment. Detective Taylor advised that [appellant] had sexually assaulted one
victim in Tucson Arizona. Detective Taylor stated that [appellant] had a mother, ... that
lived in the city limits of Arlington, TX., and may have relocated.
5. It does not resolve this question or the one appellant raised in the Court of Appeals to decide, as
the Court of Appeals did, that no evidence that was obtained from the illegal arrest in Arizona was admitted
in appellant's trial in Texas.
6. The United States Supreme Court has enumerated several exceptions to the exclusionary rule. See
INS v. Lopez-Mendoza, 104 S.Ct. 3479, 3489 (1984) (exclusionary rule not applicable to INS civil
deportation proceedings); Stone v. Powell, 96 S.Ct. 3037, 3052-53 (1976) (exclusionary rule not
applicable to vindicate Fourth Amendment rights in federal habeas corpus proceedings); Janis, 96 S.Ct.
at 3035 (exclusionary rule not extended to "forbid the use in [a federal civil tax proceeding] of one
sovereign of evidence seized by a criminal law enforcement agent of another sovereign"); United States
v. Calandra, 94 S.Ct. 613, 623 (1974) (exclusionary rule not applicable to grand jury proceedings);
Harris v. New York, 91 S.Ct. 643, 645-46 (1971) (voluntary statement that is illegally obtained in
violation of prophylactic constitutional rule may be used for impeachment purposes).

7. See Crews, 100 S.Ct. at 1250-51 (Brennan, J., joined by Stewart and Stevens, JJ.) and at 1253
(Powell, J., concurring in part, joined by Blackmun, J.) and also at 1253 (White, J., concurring in the result,
joined by Burger, C.J., and Rehnquist, J.).
8. This case, therefore, illustrates other "substantial social costs exacted by the exclusionary rule for
the vindication of Fourth Amendment rights" which has "long been a source of concern." See Leon, 104
S.Ct. at 3412.
9. Justice Brennan's lead plurality opinion in Crews found it unnecessary to address that question
because (unlike this case) the record plainly disclosed "that prior to his illegal arrest, the police both knew
respondent's identity and had some basis to suspect his involvement in the very crimes with which he was
charged." See Crews, 100 S.Ct. at 1252 (Brennan, J.) (plurality op.). 
10. See Nichols v. United States, 114 S.Ct. 1921, 1926 (1994) (when a fragmented court decides
a case and no single rationale explaining the result enjoys the assent of five justices, the holding of the court
may be viewed as that position taken by those members who concurred in the judgments on the narrowest
grounds); Ex parte Smith, 977 S.W.2d 610, 611 n.4 (Tex.Cr.App. 1998) (explaining why a concurring
opinion in another case may be regarded as an opinion for this Court since it was the only opinion in that
case joined by a majority of the Court).