812 S.W.2d 303 (1989)
Charles COUNTY, Appellant,
v.
The STATE of Texas, Appellee.
No. 69793.
Court of Criminal Appeals of Texas, En Banc.
March 29, 1989.
Rehearing Granted November 29, 1989.
On Rehearing May 15, 1991.
Rehearing Overruled July 3, 1991.
*305 Charles D. Butts and R. Robert Willmann, Jr., San Antonio, for appellant.
Fred G. Rodriguez, Dist. Atty., Charles Strauss, Bill Harris, and Jay Brandon, Asst. Dist. Attys., San Antonio, and Robert Huttash, State's Atty., Austin, for the State.
Before the court en banc.

OPINION
CAMPBELL, Judge.
Appeal is taken from a conviction for capital murder. V.T.C.A., Penal Code § 19.03(a)(3). The murder was committed in Bexar County and appellant was tried in Cameron County on a motion for change of venue. Appellant was convicted of intentionally causing the death of Chere Buffington by shooting her with a gun for promise of remuneration to be paid by James Buffington.[1] After finding appellant guilty of the offense of capital murder, the jury returned affirmative findings to the special issues under Article 37.071, V.A.C.C.P. Punishment was assessed at death.
Appellant raises twelve points of error. He challenges: the sufficiency of the evidence; the trial judge's instruction to the jury on the law of parties; the failure of the trial judge to quash the indictment because of the unconstitutionality of V.T.C.A. Penal Code, § 19.03 and Art. 37.071 V.A.C.C.P.; the trial judge's refusal to dismiss the indictment for failure to provide appellant with a speedy trial; failure to honor an agreement allegedly entered into by the State; the failure to provide a jury instruction concerning exculpatory statements by appellant; the failure to provide the jury with limiting instruction concerning the testimony of David Severe; the failure to grant a mistrial after the State asked an improper question during the punishment phase; the trial judge's refusal to instruct the jury on the subject of mitigating evidence during the punishment phase. We will affirm appellant's conviction.
In his ninth and tenth points of error, appellant contends there is insufficient evidence to sustain his conviction. Appellant's conviction was based wholly on circumstantial evidence. David Severe, a friend of the appellant's, testified that approximately one week before the shooting he saw the appellant and James Buffington, the husband of the deceased,[2] sitting in a truck outside appellant's house. Severe was acquainted with Buffington because they had both been employees of Cliff's Fence Company several years earlier. Buffington then currently owned Jim's Fence Company and appellant was his employee. As Severe approached the truck, he overheard Buffington telling appellant that he wanted his wife, Chere Buffington, killed. Buffington stopped talking when he saw Severe approaching, but after appellant told him that Severe would be the person helping him, Buffington continued, saying that he wanted his wife's body to be discovered nude and for her purse to be taken, in order to give the appearance of a robbery and a rape. Buffington said that he would be out of the state at the time of the murder so that he could not be connected to the murder. Buffington told appellant and Severe that they would be "well taken care of." Appellant later told Severe he would be paid "two or three thousand dollars."[3] After Buffington left the appellant's *306 house, Severe told appellant that he did not wish to participate in the murder. It was only after appellant's insistence that Severe "not let him down" that he consented to think it over. The Friday before the murder, appellant came by Severe's house and told him that everything was set and that he should be ready because Chere, the intended victim, was supposed to pick them up at 7:00 a.m.[4] Severe told appellant that he did not want to participate, and appellant said that he would get someone else to help him.
Ed Reinees, an employee of Buffington's, testified that he left a Jim's Fence Company truck, a blue Ford club cab pickup, with appellant over the weekend. Reinees took Buffington and a lady friend to the airport that Friday afternoon.
Willie Wilburn, the appellant's father-inlaw, testified that on the morning of Saturday, March 20th, 1976, the day of the murder, he drove the appellant, one Charlie Moore, and two or three others to the victim's apartment in the blue company pickup. Appellant got out of the truck and went to an apartment. Moore told one of the passengers in the truck that the reason for going to the apartment was to pick up a check. Appellant soon returned, saying that, "the lady wasn't home." Appellant wrote a note on an envelope and left it on the door. After leaving the apartment complex, appellant and the others returned to the west side of San Antonio and retired to a bar.
Sometime later that afternoon, appellant and Moore left the bar together, saying that they were going to get some money. Appellant and Moore left and returned to the bar later that day. Appellant had what appeared to be a check in his pocket.
Johnny Rodriguez, who owned a local grocery store, testified[5] that appellant and Moore came to his store on the evening of March 20th and asked him to cash two payroll checks drawn on Jim's Fence Company.
Mildred Gulley testified that, about 5 o'clock the afternoon of March 20th, she and her son went to Longfellow Junior High School. In the parking lot, she observed a car and a blue super cab pickup parked side-by-side.[6] Ms. Gulley saw two black men (both appellant and Moore are black males) standing between the car and the truck. Shortly thereafter, the two men left in the pickup truck and the car remained in the parking lot.
A patrol officer with the San Antonio Independent School District noticed a car in the parking lot of Longfellow School at approximately 9:00 p.m. on the evening of March 20th. Upon checking the car, the officer observed the nude body of Chere Buffington in the back seat of the car.[7] The San Antonio police were called, and the scene was secured. Charlie Moore's palm print was discovered on the roof of the car, but the door handles had been wiped clean of fingerprints.
The medical examiner testified that the cause of death was three gunshot wounds to the head, at least two of which were fired at close range. Three bullets were recovered from the head of the deceased.
A ballistics expert testified that one of the bullets recovered from the victim was fired from the Rohm .22 caliber revolver that was recovered from Mayola Taylor's house.[8] The other two bullets that were recovered were too badly damaged to make a positive identification.
Buddy Savoy testified that, when he was with the appellant and Moore the day after *307 the murder, appellant reached under the driver's seat of the blue pickup and removed a gun. Appellant handed the gun to Savoy and told him to unload it. Savoy observed three bullets in the weapon.
In challenging the sufficiency of the evidence, appellant argues that there were "at least eight (8) other known individuals who very well could have committed this homicide." This Court will not determine whether it believes that the evidence at trial established guilt beyond a reasonable doubt, but rather will determine, after reviewing the evidence in the light most favorable to the jury's verdict, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Marras v. State, 741 S.W.2d 395, 400 (Tex.Cr.App.1987).
Traditionally, this Court has applied the outstanding reasonable hypothesis test when judging the sufficiency of evidence in "circumstantial evidence" cases. This Court has held that the reasonable hypothesis analysis is not a separate standard of review, but is merely a different formulation of the normal standard of review set out in Jackson v. Virginia, supra; Carlsen v. State, 654 S.W.2d 444, 450 (Tex.Cr.App. 1983). In other words, if the evidence supports a reasonable inference other than appellant's guilt, a finding of guilt beyond a reasonable doubt is not rational. Carlsen, supra at 449.
In the instant case, appellant had planned the murder with Buffington, the victim's husband. The murder unfolded as appellant and Buffington had planned it: i.e., the victim was discovered nude, and her purse had been taken. Appellant solicited Severe's assistance in committing the murder, saying that they would be "well taken care of." When Severe refused to participate, appellant said that he would get someone else to help him. Appellant remained in the company of Charlie Moore throughout the day of the murder. Charlie Moore's palm print was discovered on the roof of the automobile in which the victim's body was found. Appellant was seen in possession ot the murder weapon the day after the murder and appellant lived with the woman who owned the weapon. Therefore, appellant had greater access to the weapon than any of the other "suspects" that appellant alleges could have committed the offense. Further, appellant was in possession of the company truck that was identified as similar to one seen at the location where the body was found.
With regard to his sufficiency claim, appellant specifically contends that the State failed to prove that such killing was done in return for remuneration or promise of remuneration by James Buffington and that such payment was in "lawful money of the United States of America."
The record reflects that appellant was told by Buffington, in Severe's presence, that they would be "well taken care of" if they proceeded with the plan to kill Buffington's wife. Appellant later told Severe that he would be paid two or three thousand dollars for the murder. Although a specific dollar amount was discussed only between Severe and appellant, the record when taken as a whole, clearly demonstrates that appellant believed he would be compensated for the murder and that he acted upon that belief.
The evidence is sufficient to show that appellant committed murder for "remuneration or the promise of remuneration" as alleged in the indictment. See V.T.C.A. Penal Code, Section 19.03(a)(3). The conduct prohibited by the Penal Code is the killing of any person in order to receive, or for the promise of the receipt of some benefit or compensation. Thus, the focus of criminal culpability is upon the actor's state of mind. McManus v. State, 591 S.W.2d 505 (Tex.Cr.App.1980) (overruled on other grounds). Since the evidence shows that appellant participated in committing the murder, and did so upon the promise of remuneration, the evidence is sufficient under § 19.03(a)(3), supra. Appellant's points of error numbers nine and ten are overruled.
In point of error number eight appellant contends that the trial court erred by overruling his objections to the court's *308 charge to the jury on the law of parties. In developing his argument, appellant abandons his original contention and launches into an duplicitous attack on the sufficiency of the evidence, revisiting points of error nine and ten. Appellant presents nothing for review in this point of error because his argument is multifarious. Euziere v. State, 648 S.W.2d 700, 703 (Tex. Cr.App.1983); Woodard v. State, 696 S.W.2d 622, 625-26 (Tex.App.Dallas 1985) (no pet.).[9] Therefore, appellant's point of error number eight is overruled.
In his first point of error, appellant alleges that the trial court erred by overruling appellant's motion to quash the indictment based on the unconstitutional and arbitrary selectivity given to prosecutors in deciding whether to indict for capital murder. Appellant contends that, despite this Court's ruling in Fearance v. State, 620 S.W.2d 577 (Tex.Cr.App.1981) cert. denied 454 U.S. 899, 102 S.Ct. 400, 70 L.Ed.2d 215 (1981) selective prosecution in the instant case deprived him of due process of law, equal protection of the law, and "fundamental fairness."[10] The State responds that appellant has failed to prove the allegations underlying his claim, and also that to declare Art. 37.071 V.A.C.C.P. and V.T.C.A. Penal Code, § 19.03(a)(3) unconstitutional because of the actions of an individual prosecutor would be misguided.
The United States Supreme Court has established clear guidelines in determining the limits of allowable prosecutorial discretion. Prosecutorial discretion is broad, although not exempt from constitutional restraints. Wayte v. United States, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547, 556 (1985). "The decision to prosecute may not be deliberately based upon unjustifiable standards such as race, religion, or other arbitrary classification, ..." Wayte, supra at 608, 105 S.Ct. at 1531, quoting Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962). In applying these standards to the case at hand, we must assume that an appellant who raises the issue of equal protection has the burden of proving what the Supreme Court has termed "the existence of purposeful discrimination." McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 1766, 95 L.Ed.2d 262, 278 (1987) quoting Whitus v. Georgia, 385 U.S. 545, 550, 87 S.Ct. 643,646, 17 L.Ed.2d 599, 603-04 (1967). In order to succeed in a claim of abuse of prosecutorial discretion, an appellant must provide "exceptionally clear evidence" that the decision to prosecute was for an improper reason. McCleskey, supra 107 S.Ct. at 1769.
Appellant has brought forth no evidence indicating the existence of purposeful discrimination. Therefore, appellant fails to meet his burden of proof. Appellant's first point of error is overruled.
In point of error number two, appellant contends that the trial court erred by overruling his motion to dismiss for denying appellant a speedy trial. Appellant filed a written motion to dismiss for want of a speedy trial in violation of Article 32A.02, V.A.C.C.P. and both the United States and Texas[11] Constitutions. At the pretrial hearing on appellant's motion, appellant's arguments were based solely on the Texas Speedy Trial Act. A majority of this Court recently declared that statute unconstitutional *309 and void in its entirety. Meshell v. State, 739 S.W.2d 246, 257 (Tex.Cr.App. 1987).[12]
Even though the Texas Speedy Trial Act has been declared unconstitutional, we will address appellant's contention that he was denied a speedy trial under the United States Constitution. The right to a speedy trial is guaranteed by the Sixth Amendment as applied to the states by the Fourteenth Amendment. Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967).
In Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court established a balancing test of four factors to determine whether an accused has been denied a speedy trial. In each individual case, the Court requires consideration of the following factors: (1) length of delay; (2) reason for the delay; (3) the defendant's assertion of the right and (4) prejudice to the defendant resulting from the delay. Id. 407 U.S. at 531, 92 S.Ct. at 2192.
"We regard none of the four factors identified above [length of delay, reason for delay, defendant's assertion of his right, and prejudice to the defendant] as either a necessary or sufficient condition to the finding of a deprivation of the rights of speedy trial." Moore v. Arizona, 414 U.S. 25, 26, 94 S.Ct. 188, 189, 38 L.Ed.2d 183, 185 (1973).
Applying the four-prong balancing test to the facts of this case, it is clear that appellant was not denied a speedy trial. A threshold consideration is the length of delay. A mandate reversing his original conviction was delivered on May 25,1984. Appellant went to trial on May 20, 1985. The first trial setting after return of the mandate was February 11, 1985. Beginning on February 1, 1985, the 227th District Court in Bexar County conducted hearings on pretrial motions. On February 8, 1985, the trial court sustained appellant's plea to the jurisdiction and ordered the case sent back to the 197th District Court in Cameron County.[13]
No precise length of delay automatically constitutes a violation of the right to a speedy trial; however, delays ranging anywhere from fifteen months to five years have been held not violative of speedy trial rights. Grayless v. State, 567 S.W.2d 216, 220 (Tex.Cr.App.1978); Harris v. State, 489 S.W.2d 303, 308 (Tex.Cr.App.1973); Givens v. State, 749 S.W.2d 954 (Tex. AppFort Worth 1988) (no pet.).
According to Barker v. Wingo, supra 407 U.S. at 530, 92 S.Ct. at 2192, the length of delay serves in part as a "triggering" mechanism to determine if the right has been violated.
The delay that can be tolerated varies with the circumstances of each case. For example, a delay of nine months may be `wholly unreasonable' under the circumstances. Barker, supra, 407 U.S. at 528, 92 S.Ct. at 2191. Conversely, delays of two years and seven months, McCarty v. State, 498 S.W.2d 212, 215 (Tex.Cr. App.1973) and three years and eight months, Swisher v. State, 544 S.W.2d 379, 381 (Tex.Cr.App.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977), have been acceptable. Flores v. State, 625 S.W.2d 44, 46 (Tex.App. San Antonio 1981) (no writ).
The record before this Court reflects a delay of twelve months between return of the mandate on the first conviction and the second trial. In this prosecution, where the State is seeking the death penalty and appellant successfully sought and obtained a change of venue, we find that a period of one year does not constitute an undue delay. We will review the record in light of the other three factors.
*310 In looking at the second factor of the Barker analysis, we note that part of the reason for delay was the transfer of the cause from Bexar County to Cameron County in February of 1985. In recognizing the time consuming machinations of such a transfer, we find that a four month delay was not violative of appellant's constitutional rights to a speedy trial.
Appellant asserted at the pretrial hearing that the primary reason for the delay was due to the State's inability to locate a key witness, Charlie Moore. The State contended that it was at all times ready to proceed to trial. In light of the fact that Charlie Moore was not called as a witness in appellant's trial, it is difficult to conclude that the State was not ready for trial and therefore was responsible for the delay.
As to the third element of the Barker analysis, on November 28, 1984, appellant filed his first motion to discharge for want of speedy trial. Appellant then filed a second motion to discharge for speedy trial on December 14, 1984. The motions were heard by Judge Machado of the 227th District Court in Bexar County on February 1, 1985. The appellant has clearly asserted his right to a speedy trial.
In analyzing the facts in light of the fourth prong of the Barker test, we must next determine whether any delay in bringing appellant to trial resulted in any prejudice to him. The right to a speedy trial is designed to protect three general interests: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused and (3) to limit the possibility that the defense will be impaired. Barker v. Wingo, supra 407 U.S. at 532, 92 S.Ct. at 2193, Grayless v. State, supra at 221. The defendant invoking his right to a speedy trial must make some showing of prejudice resulting from the delay. Harris v. State, supra at 308 (Tex.Cr.App.1973).
The appellant has failed to make a showing of prejudice as a result of the delay. Two witnesses from the previous trial were unavailable to testify at the second trial. One of these witnesses, Johnny Rodriguez, died after the conclusion of the first trial, but prior to the return of the mandate.[14] Appellant's wife, Adella County, was also deceased at the time of the second trial. We conclude, from the record, that an all other respects the second trial proceeded much as the first.
We hold that in light of the foregoing analysis, any delay in bringing appellant to trial was not violative of his constitutional rights under the United States Constitution. Point of error number two is overruled.
Points of error three, four, and five are intermingled in that they all concern an alleged agreement between the prosecutor and appellant's attorney. Appellant contends that an agreement was reached with Charles Conaway, the former prosecutor in this case, whereby appellant would be made available to the State without his attorney, Charles Butts, being present. Pursuant to the alleged agreement, appellant was to assist the authorities in the investigation of Buffington and Moore, two unindicted co-defendants. In exchange, appellant alleged that he was promised he would not be tried for capital murder and was further promised that any evidence obtained from him would not be used against him at his trial.
The State prosecuted appellant for capital murder, which appellant argues violates the agreement. Appellant argues that this action was "in derogation of his rights under the 5th, 6th, 8th, 9th and 14th Amendments to the United States Constitution, and Article I, Sections 10, 13, 19, and 29 of the Texas Constitution, including, but not limited to, the concepts of due process, equal protection, fundamental fairness, effective assistance of counsel, right to be free of cruel and unusual punishment, unenumerated rights, and no impairment to the obligation of contracts as contained therein."[15]
*311 Pursuant to the alleged agreement, appellant: (1) was questioned by the authorities; (2) was driven around Bexar County, during which time he pointed out various locations in connection with Buffington's involvement in the crime; (3) made his wife available to the State for questioning; (4) turned over to the State the transcript of a tape recorded interview between himself and Stefano, his court appointed investigator; and (5) said he would testify in the trial of James Buffington.[16]
Charles Conaway testified that, although appellant was made available to the State on several occasions and in fact, he and his investigators were allowed free access to the appellant, he never made any representations that appellant would not be tried for capital murder. Conaway further testified that he never made any agreement with Butts or the appellant regarding their furnishing the State with information.
A meeting was held in Conaway's office between appellant, Conaway and Butts. Butts contends that at this meeting the terms of the agreement were discussed and a tape recording was made which would reflect the exact terms of this agreement. Janysek, an investigator with the District Attorney's office, testified that he knew that the meeting was tape recorded because he turned on the tape recorder, but he stated that he was not present at a time when Conaway might have made any promises to appellant. Butts requested a copy of the tape recording or a transcript and was informed that it had been lost or destroyed.
During a pretrial hearing, the trial judge was faced with two conflicting interpretations of the discussions held between opposing counsel. Defense counsel contended that an agreement had been reached whereby, in exchange for appellant's cooperation in the investigation of Buffington, appellant would not be prosecuted for capital murder and any information he furnished the authorities would not be used against him in a subsequent prosecution. Conaway, the former prosecutor, countered that no agreement had ever been reached. During arguments at the pretrial hearing, Strauss, the prosecutor in the instant case, agreed that some type of a "statement" was made by the District Attorney's office although he was not present during any of the conversations or negotiations between Conaway, Butts and the appellant.
The trial court recognized that our law allows for a grant of immunity, but further noted that a judge, and not the prosecutor, was the proper official to grant such immunity.[17] The trial court then concluded that, even though a grant of immunity in this case was not properly sanctioned by a judge, "in the interest of fairness ... the state should [not] be able to use anything which they developed against [the appellant] in the prosecution for murder." The court then suppressed the testimony of Elizabeth Archie when it found that Archie's identity was discovered by the State as a result of prosecution interviews with appellant's wife.[18]
*312 Although the trial court found that no proper grant of immunity existed, by suppressing the testimony of Archie, the trial court was in essence ratifying appellant's claim of "use" immunity after the fact. This ratification of the purported grant of "use" immunity contained an implicit finding by the trial court that the State made an agreement with appellant whereby, in exchange for his cooperation in the investigation of Chere Buffington's death, any information supplied to the authorities by appellant would not be used against him.
The initial burden of proof is on the defendant to show the existence of an immunity agreement by a preponderance of the evidence. Once this initial burden is met, the burden then shifts to the State to show, beyond a reasonable doubt, why the agreement is invalid or why the prosecution should be allowed despite the agreement. Zani v. State, 701 S.W.2d 249, 254 (Tex.Cr.App.1985). In the instant case, the appellant contends that the agreement contained two elements: (1) that appellant would not be prosecuted for capital murder and (2) that any evidence that he supplied would not be used against him. Appellant had the burden of proving the existence of both elements by a preponderance of the evidence. See Zani, supra. The State presented evidence that no agreement existed. Since the trial court suppressed the testimony of Archie it can be implied that the trial court found that appellant met his burden of proof at least to the extent of showing an agreement that appellant would be given "use" immunity.
The only issue needing resolution in points of error three through five is whether appellant sufficiently proved that an element of the agreement was that he would not be prosecuted for capital murder. In other words, appellant claims that he was entitled to some form of "limited transactional" immunity, in that, pursuant to the agreement, he could be prosecuted for any crime except, capital murder. The trial judge, in denying appellant's motion to quash the indictment, implicitly found that the terms of the agreement did not include such a grant of "limited transactional" immunity.
The existence of this portion of the agreement was contested and the trial judge as the trier of fact was entitled to resolve any conflict in the evidence. Since there was evidence to support a finding that the agreement between appellant and the State did not provide for "limited transactional" immunity, the trial court did not abuse its discretion by denying appellant's motion to quash the indictment; nor did it abuse its discretion in refusing to bar the State from proceeding with a capital murder prosecution. Appellant's points of error three, four and five are overruled.
In point of error number six, appellant argues that the trial court erred by refusing to instruct the jury regarding an exculpatory oral statement made by appellant to one of the State's witnesses.
David Severe, a State's witness, testified on direct examination concerning a conversation he had had with appellant while appellant was incarcerated in the Bexar County Jail. During cross-examination, defense counsel questioned Severe as to whether appellant had told him that he did not commit the killing. Severe testified that he did not recall appellant making that statement. When questioned further apprevious *313 trial of this case Severe had testified that the appellant told him "he didn't do it." Severe stated he still did not recall appellant making the statement but that he did not deny his previous testimony stating, "I mean, it was stated in court, it has to be true." Based on this testimony, appellant submitted the following requested jury instruction:
Your [sic] are instructed that the State has the burden of disproving beyond a reasonable doubt the statement that `I didn't kill her' or `I didn't do it' made to the witness David Savere [sic] by the Defendant Charles County at the Bexar County Jail. If you have a reasonable doubt you will resolve such doubt in favor of the Defendant Charles County and say by your verdict, `Not Guilty.'
Appellant relies on the rule in Palafox v. State, 608 S.W.2d 177 (Tex.Cr.App.1979), in arguing that it was reversible error to fail to give the jury his requested instruction. Appellant's reliance on Palafox, supra, is misplaced. Palafox holds that, "It is axiomatic in our law that where the State puts in evidence the statements of the accused party which exculpate the accused, and does not directly or indirectly disprove them, the accused is entitled to an acquittal." Dunn v. State, 721 S.W.2d 325, 331 (Tex.Cr.App.1986), quoting Palafox v. State, supra at 181.
Before the Palafox rule may be applied, it must be shown that the statement amounted to an admission of guilt by the accused plus an assertion that would exculpate him. Palafox, supra at 181. Therefore, it must first be established that the accused has admitted doing the acts which would ordinarily constitute the gravamen of the offense. Next, the statements of the accused which are alleged to be exculpatory must be such as would clear or tend to clear the accused from fault or guilt. Palafox, supra at 181; Davis v. State, 474 S.W.2d 466, 467-68 (Tex.Cr.App. 1971).
Where the accused makes no admission of guilt and his statement is entirely exculpatory, the rule may not be invoked. Rogers v. State, 687 S.W.2d 337, 345 (Tex.Cr. App.1985); Trevenio v. State, 48 Tex.Cr.R. 207, 87 S.W. 1162, 1163 (1905); Dixon v. State, 128 Tex.Cr.R. 584, 83 S.W.2d 328, 330 (1935). In the instant case, appellant never admitted his guilt. His entire theory of defense rested on the premise that someone else had committed the offense, therefore the Palafox rule does not apply.
The Palafox rule is also inapplicable in this case because the appellant, and not the State, elicited Severe's testimony concerning appellant's exculpatory statements. Palafox by its terms applies "when the state puts in [the] evidence." Id. at 181. We agree with the State that, not having introduced the exculpatory statement, they were not bound to disprove it. Appellant's point of error number six is overruled.
Appellant contends, in point of error number seven, that the trial court erred in denying appellant's requested limiting instruction as to the prior inconsistent testimony of the State's witness David Severe. The requested charge was a limiting instruction concerning the exculpatory statement of the appellant which was the subject of appellant's point of error number six. The requested instruction is as follows:
You are instructed that a witness may be impeached by showingetc. (McClung 1983 Edition, Page 198)Therefore, you are further instructed that the testimony of the witness David Severe given under oath on a prior occasion where he testified that the Defendant Charles County had told him at the Bexar County Jail that he, the Defendant, did not kill Chere Buffington, was admitted for the purpose of impeaching the witness David Severe, if you find it does impeach him, however, you cannot consider said impeachment testimony as any evidence whatever of any guilt of the Defendant Charles County.
The trial court charged the jury as follows:
You are instructed that witnesses may be impeached by showing that they have made other statements out of court, or upon a former judicial investigation of the facts, different from those made be-such *314 impeaching evidence, if any, as it may tend to affect the weight to be given the testimony of the witnesses and their credibility (if it does do so); but such impeaching evidence, if any, is not to be considered by you as tending to establish the alleged guilt of the defendant, or any fact in the case.
The charge given had the same legal effect as that requested by appellant. When a refused charge is adequately covered by the charge given, no harm is shown. Davis v. State, 651 S.W.2d 787, 792 (Tex.Cr.App.1983); Viduarri v. State, 626 S.W.2d 749, 750 (Tex.Cr.App. 1981). Finding no material difference between the jury charge appellant requested and that which he received, appellant's point of error number seven is overruled.
In his supplemental point of error (point of error number twelve), appellant complains that the trial court erred in failing to grant a mistrial after the prosecutor asked an improper question of a State's witness during the punishment phase of trial.
During the punishment phase, the prosecutor introduced into evidence State's exhibits 74 and 75 which were judgments and sentences showing that appellant had been convicted of two charges of aggravated assault 14 years earlier and had been sentenced to six months and eight months respectively in the Bexar County Jail. The State then called as a witness, a former homicide detective with the San Antonio Police Department. This witness testified that appellant's reputation for being a peaceful and law abiding citizen was bad. The prosecutor then asked the following: "Did you have an occasion to investigate the homicide death of a man by the name of Herbert Richardson and an older lady by the name of W. Green?" The investigator responded that he had investigated those cases. Appellant's counsel made several objections outside the presence of the jury, namely, that the prosecutor was attempting to go into the facts of those cases and also that the State was misleading the jury to believe that appellant was guilty of a homicide in those cases, rather than an aggravated assault. The prosecutor responded that the two deaths resulted in charges being filed against appellant and he intended to link this testimony to State's exhibits 74 and 75. The trial court sustained the objection and held that if the State wished to continue this questioning, they must be prepared to prove the extraneous homicides beyond a reasonable doubt.[19]
The State elected not to relitigate these extraneous cases and discontinued the line of questioning. No connection or materiality between the deaths of Herbert Richardson and W. Green and the death of Chere Buffington was ever established, therefore, no harm is shown.[20] No error was committed in denying appellant's motion for a mistrial. Point of error number twelve is overruled.
In point of error number eleven, appellant contends that the trial court erred in failing to instruct the jury that they could consider any evidence presented in mitigation of the penalty. Appellant neither objected to the absence of such a charge nor requested that a particular charge be given. Furthermore, there was *315 no mitigating evidence for the jury to consider. The only evidence at the punishment phase was the testimony of two Bexar County deputies who stated that the appellant had a bad reputation for being a peaceful and law abiding citizen. The State also proved that appellant had two prior convictions for aggravated assault.
It is well settled that a defendant has a right to consideration of mitigating circumstances by the jury in deciding whether or not to impose the death penalty. Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Quinones v. State, 592 S.W.2d 933, 947 (Tex.Cr.App.1980).[21]
The United States Supreme Court recently concluded in Franklin v. Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) that the trial court's refusal to give petitioner's requested special instructions did not violate his Eighth Amendment right to present mitigating evidence. Neither the instructions actually given nor the Texas Special Issues precluded jury consideration of any relevant mitigating circumstances, or otherwise unconstitutionally limited the jury's discretion. The Court refused to require special instructions even when the mitigating evidence could alone be enough to return a negative answer to one of the special issues.
This Court has steadfastly held that even when raised by the evidence and requested by appellant, there is no right to an instruction that informs the jury that they could consider mitigating circumstances in answering the special issues. Perillo v. State, 758 S.W.2d 567 (Tex.Cr.App.1988).
Even the concurring opinion of Justice O'Connor in Franklin v. Lynaugh, supra, which withheld judgment in a case in which the defendant presented mitigating evidence for the jury's consideration, would not have granted relief to this appellant in light of the fact that the record was devoid of any mitigating evidence. Failure to submit an instruction to the jury that they could consider mitigating factors in answering the two special issues was not error. Point of error number eleven is overruled.
Finding no reversible error, we affirm the judgment of the trial court.
TEAGUE, MILLER and DUNCAN, JJ., dissent to the disposition of points of error 3-5.
WHITE, J., not participating.
Before the court en banc.

OPINION ON APPELLANT'S MOTION FOR REHEARING
MILLER, Judge.
A jury convicted appellant of capital murder and sentenced him to death. The conviction was affirmed. County v. State, 812 S.W.2d 303 (Tex.Cr.App.1989).[1] Appellant filed a motion for rehearing. He included in his first ground for rehearing a request that the appeal be abated and the case remanded to the trial court to correct various alleged inaccuracies in the statement of facts, which we granted. The trial court held a hearing and the transcription was filed in this Court. We then granted rehearing on appellant's grounds numbered 2, 4, and 5, and will now reverse.
At trial, appellant moved to quash the indictment because the capital murder prosecution was barred. Appellant contended that he had an agreement with the prosecutor that appellant would be made available to the State without his attorney being present to give information concerning two unindicted co-defendants in exchange for the State's promise that he would not be tried for capital murder and that any evidence obtained from him would not be used *316 agains him at his trial. Appellant claimed on appeal that the trial court erred in overruling his motion to quash in derogation of his rights under the United States and Texas Constitutions.[2]
On original submission, this Court observed that the only issue was whether appellant sufficiently proved that non-capital prosecution was an element of the agreement. We held that the trial court implicitly found that the agreement did not include such a term when it overruled appellant's motion to quash. Since the record supported a finding that there was no agreement barring capital murder prosecution, we overruled appellant's points of error.
After this Court abated the appeal and remanded for a hearing on whether there were inaccuracies in the record, the trial judge, Hon. Pat Priest, indicated that part of the record was inaccurate. The corrections are as follows [the overstruck words were improperly transcribed and the material in brackets should be substituted][3]:
Also [And so], what you say [said] cannot be used against you in it [this]. Clearly[,] in the interest of fairness, although it was not done by a judged,] And [any] prosecutor after [can make] no good faith use of it,[.] I don't think that the State should be able to use anything which they developed [obtain] from your client, against your client in the prosecution for murder. But where I run into the real problem is on the specific premises [performance of a promise] of a prosecutor to reduce the charges. The [It] does seem fair that it be enforced, yet[,] I am not aware of a single case where this kind of issue has come up. And the courts have in fact in the past have [haven't fashioned] a remedy, we [they] are going to impose upon the [a] prosecutor to let him have it.
Judge Priest also stated that he would have added the following to the record:
The reference to "letting him have it" at the end of what I just said, in my opinion, was intended by me to be saying, "to let the defendant"that was the antecedent for the pronoun "him." "Have specific performance," which I believed to be the antecedent for theI guess that's a pronoun too, isn't it, "it."
So, in other words, I was stating that it in fact, I did indeed find that Mr. County was told that he would not be prosecuted for capital murder, and I couldn't, frankly, fathom any reason under the sun why Mr. Butts would have given Mr. Conaway carte blanche with his client with any understanding short of that; and I do not believe, in fact that he did. I think that was the understanding, and so I intended to explicitly find exactly the opposite of what the Court of Criminal Appeals found that I implicitly found. Finally, it was just my feeling that as a trial judge I had no authority to grant specific performance of a prosecutor's promise not to prosecute the capital murder, but that was a matter ... if that relief was available, it was the kind of thing that, particularly in that day, when the prosecutor had no right of an appeal of any kind, should be addressed by an appellate court and not a trial judge.
The first issue to address on rehearing is whether this Court may consider all of the information presented after the remand. The transcription contains two sets of changes. First, errors in the transcription are corrected. Second, Judge Priest adds additional information and explains what he did, or intended to do, at trial. This Court's remand order directed the trial court to correct alleged inaccuracies pursuant to Tex.R.App.Pro. 55(a), towit:
Any inaccuracies may be corrected by agreement of the parties; should any dispute arise, after filing in the appellate *317 court as to whether the statement of facts accurately discloses what occurred in the trial court, the appellate court shall submit the matter to the trial court, which shall, after notice to the parties and hearing, settle the dispute and make the statement offacts conform to what occurred in the trial court.

(emphasis added). Judge Priest's corrections and additional explanatory statements are encompassed under Rule 55(a) as requested by our order to Judge Priest.[4] Thus, we find the corrections and additions made by Judge Priest are cognizable with regard to the issues raised on rehearing.
We must now decide whether the trial judge had the authority to quash the indictment on appellant's claim that there was an agreement not to prosecute him for capital murder. In Zani v. State, 701 S.W.2d 249, 253 (Tex.Cr.App.1985), this Court stated:
Initially we emphasize that the method used by the appellant in the instant case to challenge the prosecution on the basis of the immunity grant was entirely correct. Since immunity agreements seek not only to avoid convictions but to avoid prosecutions as well, it is necessary to challenge indictments in such a way as to avoid the trial itself. A Motion to Dismiss the Indictment due to a grant of immunity is such a means of challenging a prosecution prior to trial.
Thus, appellant properly filed a pre-trial motion to quash the indictment to challenge the prosecution and the trial judge had the authority to grant that motion on a finding that an enforceable agreement not to prosecute existed.
Next, we must determine whether the trial court should have granted the motion to quash. The supplemental information shows that Judge Priest believed that there was an agreement not to prosecute. Implicity, had the judge known that he had the authority to grant the motion, he probably would have done so. We therefore hold that the motion to quash should have been granted.
Since under the terms of the agreement appellant would not be prosecuted for capital murder, harm is apparent and violation of the agreement constitutes reversible error. Appellant's grounds for rehearing are granted. The judgment of the trial court is reversed and the case is remanded.
CLINTON and OVERSTREET, JJ., concur in the result.
WHITE, J., not participating.
McCORMICK, Presiding Judge, concurring.
Few cases in recent memory present such a chequered history as the one decided today. Following affirmance of his conviction, appellant filed a motion for rehearing and for the first time presented his contention that the record, upon which we based our original opinion, was flawed with numerous inaccuracies. Following an abatement and remand, the trial court "corrected" the record and supplemented it with additional explanations. See County v. State, 812 S.W.2d at 316-317, (opinion on rehearing per Miller, J.). How such inaccuracies in the record which directly related to the main issue presented could have been so glaring and go unnoticed for so long is, indeed, appalling.
Today we reverse appellant's conviction two years after it should have been done. I write this concurrence to iterate the true intent of Rule 55 of the Rule of Appellate Procedure: disputes in the record should be resolved before briefs are filed and the cause is submitted to the appellate court. The failure timely to follow rules specifically designed to address the problems *318 presented here has caused an unjustifiable waste of judicial resources.
BAIRD, Judge, concurring on appellant's motion for rehearing.
I concur. The trial court's judgment must be reversed. However, I feel compelled to write separately to address Tex. R.App.Pro. Rule 55(a).
On October 25,1989, this Court issued an Order which abated the appeal and remanded "the cause to the trial court with directions that it [the trial court] shall, after notice to the parties and hearing, settle the alleged inaccuracies in the Statement of Facts. The record of such proceedings and any supplemental findings by the trial court are to be filed with the Clerk of this Court ..." [Emphasis added.]
The majority opinion sets forth both the corrections to the record and Judge Priest's comments regarding those corrections. At 305. The majority then considers whether to address "all of the information present ed after the remand." At 306. In other words, should the explanatory comments of Judge Priest be considered? The majority, relying on Rule 55(a), concludes "the corrections and additions made by Judge Priest are cognizable with regard to the issues raised on rehearing." At 306. I concur with that conclusion. However, I do not believe the comments are cognizable under Rule 55(a); rather, I believe they are cognizable under our Order of October 25, 1989 because I consider the explanatory comments to be "supplemental findings by the trial court" which we specifically authorized.[1]
Rule 55(a) provides a trial judge with the authority to "make the statement of facts conform to what occurred in the trial court." In my opinion, Rule 55(a) does not provide a trial judge with the authority to comment upon, explain or otherwise develop his ruling(s) at the time of trial. Therefore, the remarks in Judge Campbell's dissenting opinion are well taken. However, Judge Priest's actions were entirely consistent with our Order; Judge Priest filed a record of the remand proceedings which included a corrected statement of facts and "supplemental findings" which were expressly authorized in the Order. Judge Priest should not be faulted for following our Order.
With these comments I concur in the result reached by the majority of this Court.
CAMPBELL, Judge, dissenting on appellant's motion for rehearing.
There are two issues presented in this cause on rehearing: (1) whether a trial court may correct inaccuracies in an appellant record, pursuant to Tex.R.App.Pro. 55(a); (2) whether the Texas Rules of Appellate Procedure permit the trial court to make editorial comments about his intended action after the inaccuracies have been corrected.
Clearly the trial court can correct inaccuracies in the record pursuant to Rule 55(a), as such is contemplated by the very wording of the rule itself. Such was done in this case and I have no quarrel with this action. Just as clearly, however, I cannot conceive of the majority of an appellate court allowing a trial judge to "supplement" or "amend" an appellate record with subjective editorial comments concerning what he (the trial judge) "intended" to do at the time of trial. This "supplement" or "amendment," occurring as it does in a post-submission, post-judgment proceeding, is nothing more than a sanction by this Court of a second bite-at-the-apple by the trial court.
It is absolutely incredible to me that a majority of this court can so far stretch the intended purpose of the appellate rules as to allow the trial court to effectively "retry" part of the case and effectuate a different result. This simply is not contemplated by Rule 55(a).
If Rule 55(a) is not applicable, what about Rule 55(b) or 55(c)the only other possible procedural justification for the action taken by the majority today? Since I cannot say it any better, I offer the view of *319 the Dallas Court of Appeals in Guilder v. State, 794 S.W.2d 765 (Tex.App.Dallas 1990):
"We recognize that Texas Rule of Appellate Procedure 55(b) and (c) grants this court wide discretion to supplement the transcript or statement of facts so as to include omitted matter, [citations omitted] However, such discretion should not be exercised, in the absence of some unusual circumstance, so as to permit new material to be filed after the appellate court has written its opinion and rendered its judgment. Such action would be contrary to the spirit and purpose of Rules 54(b) (setting forth the appellate timetable) and 50(d) (placing the burden on appellant to see that a sufficient record is presented to show error requiring reversal) and would interfere with the orderly administration of justice." [citations omitted] (emphasis in original)
If Rules 55(a), (b), and (c) do not apply, what authority exists for allowing the illuminating editorial comments of the trial court in this "proceeding?" None, I submit.
To the setting of this dangerous precedent, I vigorously dissent.
NOTES
[1] Appellant was originally convicted of the capital murder of Chere Buffington in 1979 and sentenced to death. Appellant's first conviction was reversed by this Court in County v. State, 668 S.W.2d 708 (Tex.Cr.App.1984).
[2] The record is unclear as to whether Buffington and the deceased were actually divorced at the time of her murder. They did however, maintain separate residences.
[3] The decedent's life was insured by several policies totaling approximately $300,000. Either her children or James Buffington were listed as beneficiaries on each of the policies. Ed Reinees testified that, on the day before the murder, Buffington had him make a premium payment on one of the policies that was about to lapse.

Several months earlier, appellant had asked Severe if he wanted to make "some big money." Severe replied in the affirmative without inquiring as to specifics.
[4] Severe testified that Buffington was to arrange to have the victim come meet appellant the Saturday of the murder.
[5] Mr. Rodriguez had died at the time of this trial. His testimony at the former trial was read into the record.
[6] Ms. Gulley identified the car as being similar to the one in which the deceased's body was found and identified the truck as similar to the truck appellant was driving that weekend.
[7] The deceased's clothes were found in the car with her body and her purse and checkbook were recovered from a near by lake.
[8] Appellant lived with Mayola Taylor.
[9] Due to the severity of this offense and the attending punishment, we have reviewed this point of error and find that the evidence was sufficient to raise the issue that appellant, acting alone or together with Moore as a party caused the death of Chere Buffington for remuneration or promise of remuneration. The court's charge to the jury properly applied the law of parties to the facts of the case. See discussion on sufficiency of the evidence on pages 305-307.
[10] In his brief, appellant urges that section 19.03 violates notions of "fundamental fairness." This not a precise term of art and currently carries no particularized meaning under federal or Texas law. We will treat "fundamental fairness" as those concepts embodied by "due process" and "due course of law." See W. LeFave 2.4 (1984).
[11] In his brief, appellant provided several constitutional bases for this point of error. We will not address appellant's state constitutional claim under Article I, § 10 of the Texas Constitution, because of the multifarious nature of his argument. See McCambridge v. State, 712 S.W.2d 499, 501 n. 9 (Tex.Cr.App. 1986).
[12] Appellant urges that Article 32A.02, V.A.C.C.P., should be held constitutional and this Court should reverse its ruling in Meshell, supra, but cites no argument or authority in support thereof.
[13] Appellant's first trial was held in Cameron County on a change of venue from Bexar County. Appellant, in his plea to the jurisdiction, contended that the 197th District Court of Cameron County had continuing jurisdiction over this cause after the return of the mandate of reversal.
[14] At the subsequent trial, the State introduced the prior testimony of Mr. Rodriquez.
[15] We will not address appellant's state constitutional claim because of the multifarious nature of his argument. See supra note 11.
[16] Buffington was tried and convicted for the capital murder of his wife. Appellant was never called as a witness in the Buffington trial. See Buffington v. State, 652 S.W.2d 394 (Tex.Cr.App. 1983).
[17] Texas courts have long found it necessary to grant a defendant immunity in order to convict a confederate in crime. Though a procedure for a grant of immunity has not been expressly provided by the Legislature of this State, in Ex parte Uuncy, 72 Tex.Cr.R. 541, 163 S.W. 29 (Tex.Cr.App.1914), the Court made clear that such a procedure was to be recognized. In Muncy, the Court said, `The right [to grant immunity] under our law of the district attorney, with the knowledge and consent of the district judge, to guarantee immunity from prosecution and punishment has never been seriously questioned in this state." supra, 163 S.W. at 38 (emphasis added). This power has since been embodied in Art. 32.02, V.A.C.C.P. Ex parte Moorehouse, 614 S.W.2d 450, 453 n. 3 (Tex.Cr. App.1981) (Clinton, J. concurring).
[18] Archie's identity was the only evidence that the trial court found to be derived from appellant's cooperation with the authorities. Appellant also sought to suppress the testimony of David Severe and Johnny Rodriquez, contending that the State's knowledge of their identity also was discovered from statements made by appellant pursuant to the agreement. The trial court denied appellant's motion to suppress the testimony of these two witnesses. David Severe's identity as a possible witness was obtained independently from any information supplied by appellant. In a police report made some time in March of 1976, a confidential informer supplied the police with Severe's first name and the location of his residence and suggested that he was involved and was a potential witness. A police officer testified that this report was made prior to appellant being arrested.

Four days after the murder, and before any agreement was made between appellant and Conaway, appellant gave the name of the store where the deceased had taken Moore to cash his pay check on the date of the murder. This statement lead to the State's discovery of Johnny Rodriguez, the owner of the Twelve O'clock. The trial court, in denying appellant's Motion to Suppress, found that "the original statement of the defendant does identify the Twelve O'clock as the place where a check or checks was or were cashied [sic], the Motion to Suppress is denied." We agree with the trial court's findings that no evidence was given to the State pursuant to the agreement that led the State to discover the identity of either David Severe or Johnny Rodriguez.
[19] The trial court specifically stated that it did not rule that the homicides were irrelevant but stated that, `This kind of thing the State has to be prepared to put on the whole case and prove it beyond a reasonable doubt or forget it."

Article 37.071(a), V.A.C.C.P.. provides:
"In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Texas." (emphasis supplied)
Article 37.071, expressly permits the introduction of any evidence the court deems relevant at the punishment phase of a capital murder trial. See Paster v. State, 701 S.W.2d 843 (Tex.Cr.App. 1985); Smith v. State, 683 S.W.2d 393 (Tex.Cr. App.1984); Davis v. State, 597 S.W.2d 358 (Tex. Cr.App.1980); Green v. State, 587 S.W.2d 167 (Tex.Cr.App.1979).
[20] While we might surmise what the prosecutor was up to in attempting to get this evidence before the jury, he was never successful in this endeavor because the trial court sustained appellant's objection.
[21] To meet constitutional muster, the sentencers in a capital case must be allowed to consider all relevant mitigating evidence. Lockett v. Ohio, supra; Green v. Georgia, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).
[1] Appellant was originally indicted in Bexar County and the case was transferred on a change of venue to Cameron County. After this Court's opinion on original submission was delivered, the parties agreed to transfer the case back to Bexar County pursuant to Art. 31.08, V.A.C.C.P.
[2] This Court did not address appellant's state constitutional claims because his argument was multifarious.
[3] Judge Priest wrote what he believed were the exact words spoken at the hearing and compared them with the official court reporter's notes. The court reporter indicated that the Judge's notes were consistent with his notes from the trial, and the errors were likely attributable to improper transcription of the notes by the person who typed the record.
[4] The order contained the following language: "We therefore abate this appeal and remand the cause to the trial court with directions that it shall, after notice to the parties and hearing, settle the alleged inaccuracies in the Statement of Facts. The record of such proceedings and any supplemental findings by the trial court are to be filed with the Clerk of this Court within 30 days of the receipt of this order."

This is not to say, however, that we favor the procedure done here. In that vein we note with approval Presiding Judge McCormick's comments in concurrence.
[1] Rule 55(a) is not mentioned in the October 25, 1989 Order.