COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-097-CR

 

 

TRACEY ANN FRAME                                                           APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM
CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

                                           I. Introduction

In four issues, Appellant
Tracey Ann Frame appeals the trial court=s decision to admit into evidence her videotaped statement to police
and the sufficiency of the evidence to support her conviction for murder.  We affirm.

                                      II. Background Facts








The decedent, David Nixon,
and Frame lived together for approximately three years in Grapevine,
Texas.  By April 2002, the couple had
begun to experience problems in their relationship, and on April 9, 2002, the
Grapevine Police were called to their residence for a domestic
disturbance.  On April 22, 2002, Nixon=s burning body was found near a Grand Prairie industrial park.  A missing-person report had been filed by one
of Nixon=s ex-wives, Donna Lella, when their son had not heard from Nixon after
his baseball game.  The medical examiner
testified that Nixon=s body was
burned postmortem and identified the cause of death as a single gunshot wound
to the torso.  Nixon=s son testified that his father kept a handgun in the safe at his
home.  However, no gun or bullet was ever
recovered.[2]

The State presented a great
deal of circumstantial evidence against Frame at trial.  Frame did not testify at either the
guilt/innocence or punishment phases. 
However, Frame=s
out-of-court statements were entered into evidence through the testimony of
multiple witnesses and the videotaped statement she made to police.[3]








Frame made inconsistent
statements about Nixon=s
whereabouts shortly before his body was discovered.  She recounted three different stories to
three people.  She told Lella that Nixon
had gone on vacation.  She told Gary
Yarbrough, the managing director of Nixon=s real estate office, that she had no idea where Nixon was.  Lastly, she told Detective Darcey Sutton that
Nixon had moved out and was working out of state.

There was evidence that a few
months before the murder Frame had an abortion because Nixon expressed
displeasure in having another child. 
Frame claimed Nixon had Atalked her into@ having the
abortion.  Specifically, she stated that
Nixon told her if she carried the child to term she would end up like anybody
else Aliving in an apartment and driving a Honda.@  However, Frame told police she
had a miscarriage because Nixon had pushed her. 
She also told friend Carol Davis that she had a miscarriage, but later
admitted that she had an abortion.  Frame=s day planner, which was admitted at trial, details her experience of
having the abortion and her regret and self-hatred for having done so.  There was also evidence that Nixon was making
preparations to leave Frame.  In March
and April 2002, Nixon purchased a large amount of furniture and had it
delivered to a house he was leasing in Southlake.  Moreover, Nixon paid cash for the furniture
and was attempting to keep the purchase and delivery secret.








Frame rented a Penske truck,
dollies, and a hand truck[4]
around the time of the murder.  Frame
told police that she had rented the truck at Nixon=s request so he could move some of his larger items.  She also claimed to police and Davis that she
had used the truck to take some lawn chairs to Goodwill.  However, after Nixon=s body was discovered, Davis was visiting Frame and noticed the same
furniture in the lawn that had always been there.  Moreover, Detective Todd Karfs checked the
local Goodwill stores and confirmed that they had no record of Frame donating
anything.  Guinevere Edwards, who leased
the truck to Frame, testified that Frame left Nixon=s white Lexus at the store while she leased the truck.  Nixon=s friend John Hartenbower testified that he never once saw Frame drive
Nixon=s car.

Davis testified that when
Frame learned of Nixon=s death she
was not distraught, and Davis found her reaction inappropriate.  Furthermore, a nail technician who went to
lunch with Frame during this time testified that Nixon=s disappearance never came up during their conversation.








Someone matching Frame=s general description was captured on a supermarket=s surveillance tapes entering the store on April 21, 2002.[5]  Around that same time a supermarket rewards
card registered to ATracey Ann
Frame@ was used to purchase several items including muriatic acid.  A worker at a janitorial supply company
testified that he had told Frame on April 20 that muriatic acid would remove
blood stains.  She had claimed she needed
the product because her son had cleaned fish and had gotten blood somewhere
inside or outside of the house.  Frame
also purchased several other disinfectant cleaners from the janitorial supply
company.[6]

A cadaver-dog handler
testified that his dog alerted on the trunk of Frame=s black Lexus and on the recliner from Frame and Nixon=s home.  The handler also
testified that his dog could not alert to human decomposition of a specific
person.  There was testimony suggesting
that Nixon and Frame=s mattress
had been replaced.  Nixon=s ex-wife Lisa Hemby[7]
testified that the mattress depicted in police photographs was not the original
mattress and that Nixon would have been unwilling to sleep on the mattress in
the pictures.  Moreover, detective Larry
Hallmark testified that the mattress and box spring did not match.








Before Nixon=s body was set ablaze, it was apparently wrapped in an electric
blanket because the wires from the blanket were still discernible on his
remains.  Police recovered a control
device for an electrical blanket from Frame and Nixon=s bedroom but found no electric blankets in the residence.  However, the blanket found on Nixon=s body and the control device from the residence were never tested to
see if they matched.

At trial, Frame suggested and
put forth numerous alternative theories. 
Frame claimed that both of Nixon=s ex-wives had motives to want him dead.  Particularly, Frame contended that Lella,
Nixon=s first wife, had financial reasons to want Nixon dead.  Two weeks prior to his murder, Nixon had
notified Lella that he was taking out a life insurance policy with their son as
beneficiary and her as cobeneficiary. 
Lella estimated this policy to be worth several million dollars.  Furthermore, Yarbrough testified that after
Nixon=s death, he went to Lella=s house to plan Nixon=s eulogy and witnessed Aa shouting match@ between
Lella and her parents.  They were arguing
whether they should buy a new car or house with the insurance money or wait for
things to settle down.  Lella denied this
argument took place.  Lastly, in February
2002 Nixon had executed a holographic will that left all of his estate to his
and Lella=s minor son.








Hemby, Nixon=s second wife, testified that she and Nixon had a rough divorce and
admitted that he had obtained a temporary protective order against her.  Hemby invoked her Fifth Amendment rights when
questioned about her past threats to Nixon. 
There was also evidence that another body with similar signatures was
found in the same industrial park one hundred yards from Nixon=s body.  Both bodies were
wrapped in tarps and burned.[8]  Lastly, there was evidence that Nixon had
$20,000 on his person just prior to being murdered that was never recovered. 

Frame further asserted that
there was no physical evidence linking her to the murder.  All luminal tests were negative and no evidence
was presented that indicated muriatic acid or any other cleaner was used on a
tested surface.

The jury found Frame guilty
of murder and assessed punishment at forty years= confinement.

                               III. Frame=s Statement to Police








In her first issue, Frame
complains that the trial court should have suppressed her statement made to
police because it resulted from an uncounseled, unwarned, custodial
interrogation.  In her second issue,
Frame asserts that her statement should have been suppressed because it was
involuntary due to promise or reward.

A. Circumstances of the
Statement

After Nixon=s body was found, detectives invited Frame to the Grand Prairie police
station for an interview.  Frame=s parents drove her to the police station.  Once she arrived she was taken to a
restricted area of the police station and into an interrogation room.  The videotape reveals that no Miranda
warnings were ever given and that at no time was she told she could terminate
the interview or that she was free to leave.

The detectives proceeded to
question Frame about the circumstances surrounding Nixon=s disappearance and death. 
During the interview, Frame made numerous statements that were
contradicted at trial by other witnesses= statements and later testimony. 
However, Frame never confessed to murdering Nixon.  At one point during the interview, the detectives
were walking out of the interrogation room and Frame asked if her parents could
come back to the room.  One of the
detectives replied, ANot right
now.  Sit tight for a few minutes.@  Later on Frame was asked where
she planned on going after she left the police station and was given one of the
detective=s cards and
asked if she would contact him the following day after she had gotten some
rest.  Thereafter, Frame left with her
parents.








The trial court overruled
Frame=s motion to suppress the videotape and admitted the tape in its
entirety.

B. Motion to Suppress








We review a trial court=s ruling on a motion to suppress evidence under a bifurcated standard
of review.  Carmouche v. State, 10
S.W.3d 323, 327 (Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85,
89 (Tex. Crim. App. 1997).  In reviewing
the trial court=s decision,
we do not engage in our own factual review. 
Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); Best
v. State, 118 S.W.3d 857, 861 (Tex. App.CFort Worth 2003, no pet.).  The
trial judge is the sole trier of fact and judge of the credibility of the
witnesses and the weight to be given their testimony.  State v. Ross, 32 S.W.3d 853, 855
(Tex. Crim. App. 2000); State v. Ballard, 987 S.W.2d 889, 891 (Tex.
Crim. App. 1999).  Therefore, we give
almost total deference to the trial court=s rulings on (1) questions of historical fact and (2) application‑of‑law‑to‑fact
questions that turn on an evaluation of credibility and demeanor.  Montanez v. State, 195 S.W.3d 101, 108B09 (Tex. Crim. App. 2006); Johnson v. State, 68 S.W.3d 644, 652B53 (Tex. Crim. App. 2002); State v. Ballman, 157 S.W.3d 65, 68
(Tex. App.CFort Worth
2004, pet. ref=d).  But when the trial court=s rulings do not turn on the credibility and demeanor of the
witnesses, we review de novo a trial court=s rulings on mixed questions of law and fact.  Estrada v. State, 154 S.W.3d 604, 607
(Tex. Crim. App. 2005); Johnson, 68 S.W.3d at 652B53.

Stated another way, when
reviewing the trial court=s ruling on
a motion to suppress, we must view the evidence in the light most favorable to
the trial court=s ruling.  Kelly v. State, No. PD-1136-05, 2006 WL
3019246, at *8 (Tex. Crim. App. Oct. 25, 2006). 
When the trial court makes explicit fact findings, we determine whether
the evidence, when viewed in the light most favorable to the trial court=s ruling, supports those fact findings.  Id. 
We then review the trial court=s legal ruling de novo unless its explicit fact findings that are
supported by the record are also dispositive of the legal ruling.  Id.

When the record is silent on
the reasons for the trial court=s ruling, or when there are no explicit fact findings and neither
party timely requested findings and conclusions from the trial court, we imply
the necessary fact findings that would support the trial court=s ruling if the evidence, viewed in the light most favorable to the
trial court=s ruling,
supports those findings.  Id.  We then review the trial court=s legal ruling de novo unless the implied fact findings supported by
the record are also dispositive of the legal ruling.  Id.








We must uphold the trial
court=s ruling if it is supported by the record and correct under any theory
of law applicable to the case even if the trial court gave the wrong reason for
its ruling.  Armendariz v. State,
123 S.W.3d 401, 404 (Tex. Crim. App. 2003), cert. denied, 541 U.S. 974
(2004); Ross, 32 S.W.3d at 856; Romero, 800 S.W.2d at 543.

C. Custody

Custodial interrogation is
questioning initiated by law enforcement officers after a person has been taken
into custody or otherwise deprived of his freedom of action in any significant
way.  Miranda v. Arizona, 384 U.S.
436, 444, 86 S. Ct. 1602, 1612 (1966). If an investigation is not at an
accusatorial or custodial stage, a person=s Fifth Amendment rights have not yet come into play, and the
voluntariness of those rights is not implicated.  Melton v. State, 790 S.W.2d 322, 326
(Tex. Crim. App. 1990).

The determination of custody
must be made on an ad hoc basis, after considering all of the objective
circumstances.  Dowthitt v. State,
931 S.W.2d 244, 255 (Tex. Crim. App. 1996). 
Stationhouse questioning does not, in and of itself, constitute
custody.  California v. Beheler,
463 U.S. 1121, 1124B25, 103 S.
Ct. 3517, 3519B20 (1983); Oregon
v. Mathiason, 429 U.S. 492, 495, 97 S. Ct. 711, 714 (1977); Dancy v.
State, 728 S.W.2d 772, 778 (Tex. Crim. App.), cert. denied, 484 U.S.
975 (1987).








Four factors are relevant to
determining whether a person is in custody: (1) probable cause to arrest, (2)
subjective intent of the police, (3) focus of the investigation, and (4)
subjective belief of the defendant.  Dowthitt,
931 S.W.2d at 254.  Under Stansbury v.
California, factors two and four have become irrelevant except to the
extent that they may be manifested in the words or actions of police officers;
the custody determination is based entirely upon objective circumstances.  Stansbury v. California, 511 U.S. 318,
322B23, 114 S. Ct. 1526, 1528B29 (1994); Dowthitt, 931 S.W.2d at 254.  Becoming the focus of the investigation does
not equate to custody for purposes of determining whether a statement is
voluntarily given.  Meek v. State,
790 S.W.2d 618, 621 (Tex. Crim. App. 1990).








As a general rule, when a
person voluntarily accompanies law enforcement to a certain location, even
though she knows or should know that law enforcement suspects that she may have
committed or may be implicated in committing a crime, that person is not
restrained or Ain custody.@  Livingston v. State,
739 S.W.2d 311, 327 (Tex. Crim. App. 1987), cert. denied, 487 U.S. 1210
(1988).  More specifically, so long as
the circumstances show that a person is acting only upon the invitation,
request, or even urging of law enforcement, and there are no threats, either
express or implied, that she will be taken forcibly, the accompaniment is
voluntary, and such person is not in custody. 
Anderson v. State, 932 S.W.2d 502, 505 (Tex. Crim. App. 1996), cert.
denied, 521 U.S. 1122 (1997). 
However, the mere fact that an interrogation begins as noncustodial does
not prevent custody from arising later; police conduct during the encounter may
cause a consensual inquiry to escalate into custodial interrogation.  Ussery v. State, 651 S.W.2d 767, 770
(Tex. Crim. App. 1983).

The Texas Court of Criminal
Appeals has outlined at least four general situations which may constitute
custody:  (1) when the suspect is
physically deprived of his freedom of action in any significant way, (2) when a
law enforcement officer tells the suspect that she cannot leave, (3) when law
enforcement officers create a situation that would lead a reasonable person to
believe that her freedom of movement has been significantly restricted, and (4)
when there is probable cause to arrest[9]
and law enforcement officers do not tell the suspect that she is free to
leave.  Dowthitt, 931 S.W.2d at
255.








Stansbury indicates that in the first through third situations, the restriction
upon freedom of movement must amount to the degree associated with an arrest as
opposed to an investigative detention.  Id.  Concerning the fourth situation, the officers= knowledge of probable cause must be manifested to the subject, and
such manifestation could occur if information sustaining the probable cause is
related by the officers to the suspect or by the suspect to the officers.  Id.

Here, the circumstances show
that Frame was acting upon the detectives= invitation when she voluntarily went to the police station to discuss
Nixon=s disappearance and death.  See
Anderson, 932 S.W.2d at 505; Livingston, 739 S.W.2d at 327.  Moreover, even though the interview was
conducted at the police station, that, in and of itself, did not constitute
custody.  See Beheler, 463 U.S. at
1124B25, 103 S. Ct. at 3519B20; Mathiason, 429 U.S. at 495, 97 S. Ct. at 714; Dancy,
728 S.W.2d at 778.  Likewise, even though
Frame became the focus of the investigation, this does not equate to custody
for purposes of determining whether her statement was voluntarily given.  Meek, 790 S.W.2d at 621.








During the suppression
hearing Frame admitted that she knew she had not been formally arrested and was
uncertain if she had ever thought about leaving the interrogation room.  Being told to Asit tight for a few minutes@ did not deprive Frame of her freedom of action in a significant
way.  See Dowthitt, 931 S.W.2d at
255.  Furthermore, asking if her parents
could come into the interrogation room is not the same as asking to leave.  See id.  It is true that Frame was never told she
could leave and testified at the hearing that she did not feel that she could
refuse to talk to the detectives. 
However, it cannot be said that the detectives created a situation that
would lead a reasonable person to believe that her freedom of movement had been
significantly restricted.  See id.  Finally, Frame was allowed to leave the
police station once she had given the detectives her statement.  Under these facts we are unable to conclude
that the restriction of Frame=s freedom of movement amounted to the degree associated with an arrest
as opposed to an investigative detention. 
See id.

Therefore, we hold that Frame
was not in custody at the time her statement was given to police.  Because she was not in custody, her Fifth
Amendment rights had not yet come into play and the voluntariness of her
statement is not implicated.  Melton,
790 S.W.2d at 326.  Accordingly, we
uphold the trial court=s ruling
because it is supported by the record and correct under the law applicable to
this case.  See Armendariz, 123
S.W.3d at 404; Ross, 32 S.W.3d at 856; Romero, 800 S.W.2d at
543.  We overrule Frame=s first issue.

D. Promise of Benefit or
Reward








If a promise made by a person
in authority induced a confession, then that confession is inadmissible.  Penry v. State, 903 S.W.2d 715, 748
(Tex. Crim. App. 1995); Alvarez v. State, 649 S.W.2d 613, 620 (Tex.
Crim. App. 1982), cert. denied, 464 U.S. 849 (1983).  Generally, the determination of the
voluntariness of the confession depends on the totality of the circumstances
surrounding the confession.  Alvarez,
649 S.W.2d at 620.  However, before a
promise will render a confession inadmissible, the promise must be shown to
have induced the confession because it was positive for the defendant, made or
sanctioned by someone in authority, and of such an influential nature that
appellant might speak untruthfully in response. 
Muniz v. State, 851 S.W.2d 238, 254 (Tex. Crim. App.), cert.
denied, 510 U.S. 837 (1993).  In our
review, we look to whether the circumstances of the promise would reasonably
induce a defendant to admit to a crime he did not commit.  Sossamon v. State, 816 S.W.2d 340, 345
(Tex. Crim. App. 1991).

Frame argues that several
comments and lines of questioning made by the detectives during the interview
rise to the level of promises.  During
the interview, the detectives made several references to abuse that Frame may
have suffered at the hands of Nixon.  The
detectives went as far as to say they knew she had been abused and that
concerned them because they dealt with that sort of thing all the time in their
jobs as detectives.  Finally, they told Frame
that she was going to have to help herself if they were going to help her.








We can discern no logical
manner in which the above-recited statements could be construed as promises of
benefit or reward.  More importantly,
because Frame never actually confessed to any crime, she has failed to show
that the alleged promises reasonably induced her to admit to a crime she did
not commit.  Id.  Based upon the totality of the circumstances
surrounding Frame=s statement
we determine that her statement was voluntary and not the product of a promise
of benefit or reward.  See Alvarez,
649 S.W.2d at 620.  Accordingly we uphold
the trial court=s ruling
because it is supported by the record and correct under the applicable
law.  Armendariz, 123 S.W.3d at
404; Ross, 32 S.W.3d at 856; Romero, 800 S.W.2d at 543.  We overrule Frame=s second issue.

                                IV. Sufficiency of the Evidence

In her third and fourth
issues, Frame contends that the evidence was legally and factually insufficient
to support her conviction.

A. Standards of Review

In reviewing the legal
sufficiency of the evidence to support a conviction, we view all the evidence in
the light most favorable to the verdict in order to determine whether any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v.
State, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).








This standard gives full play
to the responsibility of the trier of fact to resolve conflicts in the
testimony, to weigh the evidence, and to draw reasonable inferences from basic
facts to ultimate facts.  Jackson,
443 U.S. at 319, 99 S. Ct. at 2789.  The
trier of fact is the sole judge of the weight and credibility of the
evidence.  See Tex. Code Crim. Proc. Ann. art. 38.04
(Vernon 1979); Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App.
2000).  Thus, when performing a legal
sufficiency review, we may not re-evaluate the weight and credibility of the
evidence and substitute our judgment for that of the fact finder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the
evidence in favor of the verdict.  Curry
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).  The standard of review is the same for direct
and circumstantial evidence cases.  Burden
v. State, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); Kutzner v. State,
994 S.W.2d 180, 184 (Tex. Crim. App. 1999).








When reviewing the factual
sufficiency of the evidence to support a conviction, we view all the evidence
in a neutral light, favoring neither party. 
Watson v. State, 204 S.W.3d 404, 415 (Tex. Crim. App. 2006); Drichas
v. State, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting
the conviction, although legally sufficient, is nevertheless so weak that the
fact-finder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
fact-finder=s
determination is manifestly unjust.  Watson,
204 S.W.3d at 416B17; Johnson
v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  To reverse under the second ground, we must
determine, with some objective basis in the record, that the great weight and
preponderance of all the evidence, though legally sufficient, contradicts the
verdict.  Watson, 204 S.W.3d at
417.








In determining whether the
evidence is factually insufficient to support a conviction that is nevertheless
supported by legally sufficient evidence, it is not enough that this court Aharbor a subjective level of reasonable doubt to overturn the
conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s resolution of a conflict in the evidence.  Id. 
We may not simply substitute our judgment for the fact-finder=s.  Johnson, 23 S.W.3d at
12; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s determination of the weight to be given contradictory testimonial
evidence because resolution of the conflict Aoften turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at
8.  Thus, we must give due deference to
the fact-finder=s
determinations, Aparticularly
those determinations concerning the weight and credibility of the evidence.@  Id. at 9.

An opinion addressing factual
sufficiency must include a discussion of the most important and relevant
evidence that supports the appellant=s complaint on appeal.  Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).  Moreover, an opinion reversing and remanding
on factual insufficiency grounds must detail all the evidence and clearly state
why the finding in question is factually insufficient and under which
ground.  Goodman v. State, 66
S.W.3d 283, 287 (Tex. Crim. App. 2001); Johnson, 23 S.W.3d at 7.

B. Application








As detailed above, the State
presented a great deal of evidence against Frame at trial.  Our review of the evidence in the light most
favorable to the verdict indicates that a rational trier of fact could have
found the essential elements of murder beyond a reasonable doubt.  See Jackson, 443 U.S. at 319, 99 S.
Ct. at 2789; Hampton, 165 S.W.3d at 693. 
Although there was arguably some conflicting evidence, we are not
allowed to re-evaluate the weight and credibility of the evidence and substitute
our judgment for that of the fact-finder. 
Dewberry, 4 S.W.3d at 740. 
Furthermore, we are required to resolve any inconsistencies in the
evidence in favor of the verdict.  Curry,
30 S.W.3d at 406.  Therefore, we hold
there was legally sufficient evidence to support Frame=s conviction.  Frame=s third issue is overruled.

Likewise after our review of
all the evidence in a neutral light, favoring neither party, we conclude that
the evidence supporting Frame=s conviction is also factually sufficient.  Watson, 204 S.W.3d at 417; Drichas,
175 S.W.3d at 799.

The State presented Frame=s numerous inconsistent statements, unexplained suspicious behavior,
and the circumstances of her failing relationship with Nixon as evidence
supporting conviction.  Similarly, Frame
presented evidence that contradicted the State=s evidence.  Specifically, Frame
pointed to the lack of physical and forensic evidence tying her to Nixon=s murder and even proffered the possibility that others had a reason
to want Nixon dead.  The jury agreed with
the State.

We may not simply substitute
our judgment for the jury=s.  Johnson, 23 S.W.3d at 12; Cain,
958 S.W.2d at 407.  Under these facts the
record does not clearly reveal that a different result was appropriate, and
therefore we must defer to the jury=s determination of the weight to be given contradictory testimonial
evidence because resolution of the conflict Aoften turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at
8.








Therefore, we hold the
evidence supporting Frame=s conviction
was not so weak that the jury=s determination was clearly wrong and manifestly unjust.  Moreover, we also hold that the conflicting
evidence did not so greatly outweigh the evidence supporting her conviction
that the jury=s
determination was manifestly unjust.  See
Watson, 204 S.W.3d at 416B17; Johnson, 23 S.W.3d at 11. 
We overrule Frame=s fourth
issue.

                                           V. Conclusion

Having overruled Frame=s four issues, we affirm the trial court=s judgment.

 

 

BOB MCCOY

JUSTICE

 

PANEL B:   LIVINGSTON, GARDNER, and MCCOY, JJ.

 

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:
December 14, 2006











[1]See Tex. R. App. P. 47.4.





[2]The
medical examiner testified that the bullet was not recovered because it was
either lost during transport of the decomposed body or had exited the body and
the exit wound was destroyed by the postmortem fire.





[3]The
facts and circumstances of the videotaped statement are discussed in section
III.A. of this opinion.  





[4]There
was testimony that a hand truck is Aan appliance.  You can move a refrigerator with it.@





[5]The
quality of the video was too poor for a positive identification.  





[6]Frame
purchased Tile and Stone cleaner, Lysol Kitchen cleaner, Lemon Extra, X-14,
Fresh and Clean, and Kil=z
Odor.





[7]Hemby
had lived in the same house and slept on the same bed when she and Nixon were
married.





[8]The
medical examiner testified that Nixon=s body was wrapped in an
electrical blanket and that there were fragments of burned plastic tarp stuck
to the body.





[9]Probable cause to arrest exists
when, at that moment, the facts and circumstances within the knowledge of the
arresting officer and of which he has reasonably trustworthy information would
warrant a reasonable and prudent man in believing that a particular person has
committed or is committing a crime.   Jones v. State, 493 S.W.2d 933, 935 (Tex. Crim. App.
1973).